ARTHUR R. KROHNERT, Plaintiff-Appellee, *v.* YACHT SYSTEMS HAWAII, INC.; LARRY WYLIE; R. D. WATERMAN; C. J. MacKENZIE AND ASSOCIATES, LTD., Defendants, and R. W. DICKIESON, Defendant-Appellant

NO. 8347

(CIVIL NO. 51335)

MAY 12, 1983

BURNS, C.J., HEEN AND TANAKA, JJ.

OPINION OF THE COURT BY BURNS, C.J.

In this action for damages allegedly caused by his errors and omissions as a marine surveyor, defendant Robert W. Dickieson (Dickieson) appeals from the judgment in favor of

plaintiff Arthur R. Krohnert (Krohnert).[1] Finding no error, we affirm.[2]

Richard D. Waterman (Waterman) owned a 32-foot wooden ketch, the "Waikane." By listing agreement dated November 20, 1975, Waterman hired defendant Yacht Systems Hawaii, Inc. (Yacht Systems) as his agent to sell the Waikane. Following negotiations with Larry Wylie (Wylie), a broker employed by Yacht Systems, Krohnert offered to purchase the Waikane for $20,000.00. Waterman accepted the offer on April 18, 1976.

The Offer to Purchase and Sales Agreement provided that the Waikane was to be made available to Krohnert for sea trial, drydocking, and marine survey on or before June 1, 1976, the designated closing date. If the sea trial proved to be unsatisfactory or latent defects were found, Krohnert was allowed to withdraw his offer by written notice to Yacht Systems, tendered within 24 hours of the sea trial or survey.

A sea trial of the Waikane was held on or about April 25, 1976, at which time the boat performed to Krohnert's satisfaction. Subsequently, while attempting to obtain insurance and financing to purchase the Waikane, Krohnert learned that a marine survey was necessary.

Krohnert contacted Wylie and asked him to recommend a marine surveyor who could conduct an immediate survey of the Waikane. Wylie recommended four marine surveying companies, and Krohnert selected defendant C. J. MacKenzie & Associates, Ltd. On Krohnert's behalf, Wylie contacted C. J. MacKenzie & Associates, Ltd., and retained the services of Dickieson,[3] to conduct an in-water survey of the Waikane.

---

[1] Count IV of the original complaint charged Dickieson and other defendants with fraudulent and deceptive trade practices. This allegation, however, was deleted in Krohnert's amended complaint.

[2] Dickieson also appealed the denial of his Rule 41(b), Hawaii Rules of Civil Procedure, motion to dismiss which he made after Krohnert completed presentation of his evidence. After Dickieson's motion was denied, however, he presented evidence. Consequently, he waived his right to appeal the denial of his motion. 9 Wright & Miller, Federal Practice and Procedure: *Civil* § 2371 (1971).

[3] Dickieson was an independent contractor, not an employee, associated with C. J. MacKenzie & Associates, Ltd.

After conducting an in-water survey of the Waikane on July 23, 1976, Dickieson prepared a report "for the purpose of ascertaining the condition of the boat for insurance and/or loan purposes only." Concerning the condition of the boat, his report stated:

No removals were made for this inspection.

There is no evidence of dry rot or softwood. The boat appears to be made of good material and is well fastened. The vessel lay afloat and hence the bottom cannot be vouched for. There is, however, no reason to suspect its condition.

\* \* \*

The "WAIKANE" is considered to be a satisfactory insurance risk.

The one-page report was typed in approximately 11-point type. At the very bottom of the report, more than an inch below Dickieson's signature, the following was printed in approximately 7-point type:

THIS REPORT IS ISSUED SUBJECT TO THE CONDITION THAT IT IS UNDERSTOOD AND AGREED THAT NEITHER THIS OFFICE NOR ANY SURVEYOR OR ANY EMPLOYEE THEREOF IS UNDER ANY CIRCUMSTANCES WHATSOEVER TO BE HELD RESPONSIBLE IN ANY WAY FOR ANY ERROR IN JUDGMENT, DEFAULT OR NEGLIGENCE NOR FOR ANY INACCURACY, OMISSION, MISRPRESENTATION OR MISSTATEMENT IN THIS REPORT, AND THAT THE USE OF THIS REPORT SHALL BE CONSTRUED TO BE AN ACCEPTANCE OF THE FOREGOING CONDITIONS.

The sale was closed on or about July 26, 1976.[4] About three days after the closing, Krohnert was lying in a bunk on the boat and heard "creaking" sounds. He decided to investigate and looked below the portside berth by removing the mattress and the piece of wood on which the mattress lay. Krohnert saw that the ceiling[5] under the bunk had been cut away and noticed a

---

[4] Krohnert had difficulty obtaining financing and apparently time was not of the essence.

[5] Like a house with double-wall construction, the Waikane had planking on the outside as well as the inside of its ribs. Because such boats were usually built upside down, the interior planking was called the "ceiling."

discoloration of the wood approximately two and one-half feet above the waterline.

Krohnert called Wylie and another man, both of whom told him not to worry about the boat and to just enjoy it. He took their advice and thereafter sailed the boat approximately eight times. Krohnert, however, again became concerned about the condition of the boat when he began having problems with running rust.[6]

On August 29, 1976, approximately five weeks after purchasing the Waikane, Krohnert had the boat hauled out of the water at Keehi Drydock. In a report to Krohnert regarding the general condition of the Waikane's bottom on August 29, 1976, Sam Ervin, the yard foreman at Keehi Drydock, stated *inter alia:*[7]

> The boat was inspected by general probing of the bottom. Most areas probed were soft enough to allow a knife to be poked in 1/2 to 3/4 of an inch. Some areas allowed the knife to go completely through.

> The bottom was sandblasted to remove the bottom paint so the whole bottom could be seen clearly. The bottom was covered with large black spots, especially around the plugs covering the fasteners. These areas were very soft, like well compacted moist potting soil, which could be dug out easily.

> The majority of the planking on the bottom of the boat was removed. The exposed frames were mostly rotten. They were steam bent oak frames with iron fastenings holding the planking onto the frames. Most of the iron fasteners had corroded away damaging the wood in the area. Some frames were so soft that they could be broken out by hand. The floor timbers connecting the frames to the keel were also rotten in the mid-section of the boat.

---

[6] Running rust is a condition where rust on fasteners dissolves in the water and seeps out between the planks to discolor the side of the boat.

[7] Plaintiff's exhibit number 12. Although Dickieson objected to the admission of the report as being hearsay, he did not raise the issue on appeal.

The rudder was deteriorated to the point that the top third was nearly broken off.

The major defects were repaired by Keehi Drydock at a cost of $9,049.00. Krohnert subsequently had a new survey of the Waikane done in order to renew his insurance. Although the boat below the waterline was in good condition, marine surveyor Dennis Smith (Smith) concluded that the overall condition of the Waikane was deteriorating and, therefore, Krohnert was unable to obtain insurance on it. He eventually sold the boat for $11,000.00.

Suit was brought by Krohnert against Waterman, Yacht Systems, Wylie, C. J. MacKenzie and Associates, Ltd., and Dickieson. Summary judgment was entered in favor of all defendants except Dickieson. Dickieson did not cross-claim against or seek contribution from the other defendants at trial. *See Park v. Esperanza,* 4 Haw. App. 91, 662 P.2d 214 (1983).

On appeal, Dickieson raises the following issues:

1. Did the lower court err in its definition of the duty owed by a marine surveyor?

2. Did the lower court clearly err in making certain findings of fact?

3. Did the lower court err in refusing to enforce the provision which attempted to exonerate Dickieson from liability for his negligence in conducting the survey?

Our answer to all issues above is, "No."

I.

Dickieson's first contention is that the lower court's definition of the duty owed by him was wrong because it makes the marine surveyor a guarantor of the correctness of his surveys and an insurer against latent defects. We disagree.

The court in *Great American Insurance Co. v. Bureau Veritas,* 338 F. Supp. 999 (S.D.N.Y. 1972), *aff'd,* 478 F.2d 235

(2d Cir. 1973), identified two duties owed by a survey and classification society to its clients, one of which is the use of due care to detect defects in ships which the society surveys and to notify the owner or charterer of such defects. *Great American,* 338 F. Supp. at 1011-1012. For breach of this duty, tort liability may be imposed.[8] *Great American, supra; Dillingham Tug & Barge Corp. v. Collier Carbon & Chemical Corp.,* 548 F.Supp. 691, 698 (N.D. Calif. 1981).

Dickieson attempts to negate this duty to detect and warn by distinguishing an insurance and financing survey from a condition survey, and contending that a less extensive inspection is required for the former. According to Dickieson's own testimony, however, the only difference between the two kinds of surveys is that the condition survey includes a listing of merely cosmetic defects. Thus, we conclude that in both an insurance and financing survey and a condition survey, a marine surveyor has the duty to use due care to detect and give notice of perceptible structural defects.

The duty to use "due care" means that a marine surveyor will be held to a standard of "good marine surveying practice," i.e., what is "customary and usual in the practice."[9] In this case, the trial court concluded that Dickieson owed to Krohnert "a duty to use such ordinary care and caution in the exercise of his

---

[8] We note that the surveyor in *Great American* was not held liable for the sinking of a ship which it had surveyed, even though the surveyor had breached its duty to detect and warn of hazards. The reason, however, was because the surveyor's breach of duty was not the proximate cause of the sinking since the owner and charterer had been fully informed by another surveyor of certain defects and had elected not to remedy them. Likewise, the causal chain was broken in *The Steamship Mutual Underwriting Assoc., Ltd. v. Bureau Veritas,* 380 F.Supp. 482 (E.D. Louisiana 1973), where the surveyor's negligence in failing to detect a defect was found to not be the proximate cause of the sinking of the ship. *C.f., Ramirez v. Mookini,* 24 Cal.Rptr. 354 (Dist. Ct. App. 1962) (although land surveyor negligent, his error in making surveys was not the proximate cause of plaintiff's damage).

[9] This is not to say, however, that an entire industry can adopt careless methods to save time, effort, or money and thereby set a deficient standard. Prosser, *Handbook of The Law of Torts* 167 (4th ed. 1971).

profession as would be expected of a similarly situated individual in the City and County of Honolulu, State of Hawaii[.]" In our view, the trial court correctly defined the duty owed.

II.

The next question is whether the lower court erred in finding that Dickieson breached his duty and that he was negligent in failing to discover and inform Krohnert of the deteriorated condition of the boat's bottom. Specifically, Dickieson urges this court to find that the lower court erred in making the following determinative findings of fact:

9. The latent defects and deteriorated structural condition existed on July 23, 1977, the date of the survey.

\*    \*    \*

12. \* \* \* A properly conducted in-water survey would have determined that the vessel "Waikane" contained latent defects.

13. A marine surveyor practicing his profession in the City and County of Honolulu, State of Hawaii, utilizing such skill and judgment as is ordinarily exercised by similarly situated professionals acting in a reasonable manner, would have discovered the conditions identified by the witnesses of all parties as "wood rot", "dry rot", "galvanic action", or otherwise, which conditions indicated the existence of latent defects and the deteriorated and unsafe structural condition.

\*    \*    \*

16. Plaintiff KROHNERT relied upon Defendant R. W. DICKIESON's survey, (Plaintiff's Exhibit "2") in completing the purchase of said vessel, and such reliance placed by Plaintiff KROHNERT on Defendant R. W. DICKIESON's survey was reasonable in light of all the attendant circumstances.

Findings of fact shall not be set aside unless clearly erroneous. Rule 52(a), Hawaii Rules of Civil Procedure. Findings of fact are clearly erroneous unless supported by substantial evi-

dence in the record. *Shoemaker v. Takai,* 57 Haw. 599, 561 P.2d 1286 (1977). Substantial evidence is credible evidence which is of sufficient quantity and probative value to justify a reasonable man in reaching a conclusion. *In re Charley's Tour & Transp. Inc.,* 55 Haw. 463, 522 P.2d 1272 (1974). The credibility of the testimony is for the trial court to determine. *Shinn v. Edwin Yee, Ltd.,* 57 Haw. 215, 553 P.2d 733 (1976). Although the findings are supported by "substantial evidence," they may be set aside on appeal if the appellate court decides that they are against the clear weight of the evidence or otherwise reaches a definite and firm conviction that a mistake has been made. *Kim v. State,* 62 Haw. 483, 616 P.2d 1376 (1980); *Yorita v. Okumoto,* 3 Haw. App. 152, 643 P.2d 820 (1982); 9 Wright & Miller, Federal Practice and Procedure: *Civil* § 2585 (1971). This exception, however, may not apply to appellate review of jury verdicts. *State v. Yoshimoto,* 64 Haw. 1 (1981); *Lovell v. Campbell-Burns,* 3 Haw. App. 531 (No. 7539, December 2, 1982).

From our review of the record on appeal, we conclude that there was substantial evidence to support the trial judge's findings of fact,[10] that the findings were not against the clear

---

[10] As one of his points on appeal, Dickieson contends that the lower court erred in admitting several pieces of rotted wood (plaintiff's exhibit numbers 5, 6, and 7), photographs of the Waikane taken at the Keehi drydock (plaintiff's exhibit numbers 9, 10, and 11), and two marine surveys of another boat (plaintiff's exhibit numbers 15 and 16). Dickieson contends that the evidence was admitted improperly because the pieces of rotted wood were not properly authenticated or identified as required by Rule 901 of the Hawaii Rules of Evidence (HRE), the photographs were not a true and accurate representation of the Waikane's condition at the time of the survey and no proper foundation had been laid for their admission, and the prior surveys were evidence of other wrongs which were inadmissible under Rule 404(b).

However, as we stated in *Santos v. Perreira,* 2 Haw. App. 387, 633 P.2d 1118, 1124 (1981):

The trial court's error is reversible error only if (1) all of the competent evidence is insufficient to support the judgment; or (2) it affirmatively appears that but for the incompetent evidence (or the improper use of the competent evidence), the trial court's decision would have been otherwise. *Associated Eng'rs & Constrs. v. State,* 58 Haw. 187, 567 P.2d 397, *reh. denied,* 58 Haw. 322, 568 P.2d 512 (1977).

We find that the trial court's error, if any, is not reversible. Even without the contested exhibits, there was ample other evidence establishing the extent of the Waikane's deterioration, *see* n. 7 and accompanying text, and Dickieson's negligence.

weight of the evidence, and that a mistake has not been made. Consequently, we hold that the lower court's findings of fact are not clearly erroneous.

### III.

Dickieson contends that the printed statement at the bottom of the survey report clearly and validly exonerated him from liability for his own negligence. While conceding that such exculpatory clauses are generally disfavored by the courts and are void as against public policy in certain cases,[11] Dickieson argues that the policy of freedom of contract operates in favor of exculpatory clauses in cases where the parties are of equal bargaining power and the language of the clause is clear and unambiguous.

It is true that a party can contract to exempt himself from liability for harm caused by his negligence. Comment to Restatement 2nd of Contracts, § 195; 15 Williston on Contracts, § 1750A at 144 (3d ed. 1972). It is also true that "[s]uch bargains are not favored, however, and, if possible, bargains are construed not to confer this immunity." Williston, *supra*, § 1750A at 144-145.

In a case striking down an exculpatory provision in a ship towing contract, the United States Supreme Court stated, "The two main reasons for the creation and application of the rule [invalidating such provisions] have been (1) to discourage negligence by making wrongdoers pay damages, and (2) to protect those in need of goods or services from being overreached by others who have power to drive hard bargains."

---

Thus, the trial court's admission of the wood, photographs, and survey was not unfairly prejudicial, Rule 403, HRE, nor did it affect a substantial right of Dickieson, Rule 103, HRE; Rule 61, Hawaii Rules of Civil Procedure, and the error, if any, in admitting the evidence was harmless. *Dang v. F & S Land Development Corp.*, 62 Haw. 583, 593, 618 P.2d 276, 283 (1980); *see Kekua v. Kaiser Foundation Hospital*, 61 Haw. 208, 218-220, 601 P.2d 364 (1979); *Doe II v. Roe II*, 3 Haw. App. 233, 647 P.2d 305, 310 (1982); *Santos v. Perreira*, 2 Haw. App. 387, 633 P.2d 1118, 1124 (1981).

[11] *See Great American*, 338 F.Supp. at 1010, n. 6.

*Bisso v. Inland Waterways Corp.,* 349 U.S. 85, 91, 75 S.Ct. 629, 99 L.Ed. 911 (1955). In light of these reasons, exculpatory clauses are valid only if:

> [t]hey are strictly construed against the promisee and will not be enforced if the promisee enjoys a bargaining power superior to the promisor, as where the promisor is required to deal with the promisee on his own terms. * * * Nor will a contract be enforced if it has the effect of exempting a party from negligence in the performing of a public duty, or where a public interest is involved. * * *

*Lynch v. Santa Fe National Bank,* 97 N.M. 554, 627 P.2d 1247, 1249 (1981), quoting *Tyler v. Dowell, Inc.,* 274 F.2d 890, 895 (10th Cir. 1960), *cert. denied* 363 U.S. 812, 4 L.Ed.2d 1153 (1960) (citations omitted); *see* Annot., 6 A.L.R. 3d 704, 705 (1966); Annot. 175 A.L.R. 1, 14-16 (1948); 57 Am. Jur. 2d *Negligence* §§ 20, 27-30 (1971).

The superior bargaining power referred to in the passage above "involves the absence of alternatives; specifically whether plaintiffs were 'free to sue or not to use' defendant's . . . services." *Lynch, supra,* 627 P.2d at 1250. Public interest has been defined as involving some or all of the following characteristics:

> [1] It concerns a business of a type generally thought suitable for public regulation.

> [2] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public.

> [3] The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards.

> [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services.

> [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract

of exculpation and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence.

[6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller [of the service], subject to the risk of carelessness by the seller or his agents.

*Lynch, supra,* 627 P.2d at 1251-52, citing *Tunkl v. Regents of University of California,* 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441, 445-446, 6 A.L.R. 3d 693, 698-700 (1963) (footnote in *Lynch* omitted).

Applying these principles to the case at bar, we find that the clear and unambiguous exculpatory provision in the marine survey was permissible. Dickieson held no superior bargaining power over Krohnert since the latter had three alternative surveying companies provided to him by Wylie and later employed Smith whose survey reports did not contain exculpatory provisions. Unlike a common carrier or a utility company, we do not believe that a marine surveyor falls within the definition above or is affected with such a public interest as to make him ineligible to bargain for exculpatory provisions.

Although the exculpatory clause was permissible, it is not enforceable in this case. Before an exculpatory clause may be enforced against a party, it must be shown that he clearly and unequivocally agreed to the disclaimer with knowledge of its content. *Tyler, supra,* 275 F.2d at 895; Litvinoff, *Stipulations as to Liability and as to Damages,* 51 Tulane L. Rev. 258, 296 (1978); *see also Earl M. Jorgensen Co. v. Mark Construction,* 56 Haw. 466, 470, 540 P.2d 978 (1975). The burden of establishing consent to an exculpatory clause falls upon the party who seeks to negate his liability for negligence by relying upon such provision.[12]

---

[12] While the plaintiff has the initial burden of proving negligence and losses caused thereby, the party relying upon an exculpatory provision carries the burden of establishing its validity. *Great American,* 338 F.Supp. at 1006, n. 3.

In this case, we find that Dickieson failed to meet his burden of proving that Krohnert clearly and unequivocally agreed to the disclaimer. Krohnert's uncontradicted testimony was that Dickieson made no mention of an exculpatory clause prior to doing the survey, and there is no evidence that the disclaimer was mentioned or bargained for by Dickieson or his employer when Wylie requested the survey. Krohnert testified that he did not see the exculpatory clause until he read it in the survey report. Although the disclaimer provided that "the use of this report shall be construed to be an acceptance of the foregoing conditions," in our view Krohnert's reasonable reliance on the report did not constitute the required clear and unequivocal acceptance of the exculpatory provision.

Judgment affirmed.

*Stephen D. Whittaker* (*Case, Kay & Lynch* of counsel) for defendant-appellant.

*David Bettencourt* for plaintiff-appellee.