**Charles J. RUSS, Sr., Plaintiff and Appellant,**

v.

**WOODSIDE HOMES, INC., a Utah corporation; and Does I through XXX, inclusive, Defendants and Appellees.**

**No. 950157–CA.**

Court of Appeals of Utah.

Oct. 26, 1995.

Charles F. Abbott and Nelson Abbott, Abbott & Abbott, Provo, for Appellant.

Paul S. Felt and Robert O. Rice, Ray, Quinney & Nebeker, Salt Lake City, for Appellees.

Before BILLINGS, GREENWOOD and JACKSON, JJ.

## OPINION

JACKSON, Judge:

Charles J. Russ, Sr. appeals the trial court's grant of Woodside Homes, Inc.'s motion for summary judgment. Woodside moved to dismiss Russ's wrongful death action on the basis of a hold harmless provision in the parties' agreement to commence construction. We affirm.

## FACTS

On September 12, 1992, Charles J. Russ, Sr. and his wife, Rose Pauline Russ, signed a contract under which Woodside agreed to construct a home for the Russes. Linda Breinholt, a sales consultant for Woodside, signed the contract on September 11, 1992, and a vice president of Woodside accepted the contract on September 16, 1992.

Addendum B of that contract is an "Agreement to Commence Construction," containing a paragraph titled "Job Site Visits." The Job Site Visit paragraph reads as follows:

> The construction site is a dangerous place to visit. Buyer agrees to exercise extreme caution if Buyer chooses to visit the site, to limit the number of such visits, and to refrain from allowing Buyer's or other children to accompany Buyer on such visits. Buyer, to the fullest extent permitted by law, agrees to hold harmless Woodside (including its affiliates and subsidiaries and other contractors and subcontractors and their agents and employees) from any and all claims, damages, loss and expenses, including but not limited to attorney's fees, arising out of any death, accident, injury,

or other occurrence resulting from visits to the job site by Buyer or Buyer's family or other guests.

The Russes visited the construction site a few days before Thanksgiving of 1992. While visiting the construction site, Mrs. Russ slipped and fell into a hole in the driveway in front of the house. Injuries from the fall resulted in a blood clot. Mrs. Russ died approximately two weeks later on December 12, 1992.

Russ filed the instant suit against Woodside on March 1, 1994, alleging survival of action for injury and wrongful death. Russ's claim sounded in negligence and sought both general and special damages. Woodside moved for summary judgment on the basis of the contract's hold harmless provision. The trial court granted Woodside's motion, and this appeal followed.

### ISSUES

Russ's appeal presents two issues for our review: (1) whether the language of the provision is clear and unequivocal; and (2) whether the provision violates public policy and thus is rendered void.

### STANDARD OF REVIEW

■ It is well established that Utah appellate courts review grants of summary judgment for correctness. *Transamerica Cash Reserve, Inc. v. Dixie Power & Water, Inc.,* 789 P.2d 24, 25 (Utah 1990); *Oquirrh Assocs. v. First Nat'l Leasing Co.,* 888 P.2d 659, 662 (Utah App.1994). Trial courts shall grant summary judgment only when the moving party has shown that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Utah R.Civ.P. 56(c). We do not defer to the trial court's conclusions on summary judgment. *Higgins v. Salt Lake County,* 855 P.2d 231, 235 (Utah 1993); *Callahan v. Sheaffer,* 877 P.2d 1259, 1260–61 (Utah App.1994).

### ANALYSIS

#### I. The Hold Harmless Provision's Language

Russ argues that the hold harmless provision does not clearly and unequivocally re-

lease Woodside for potential negligence and that the provision is ambiguous on its face. Woodside responds that the hold harmless provision's language is clear, unequivocal, and covers Russ's claims against Woodside for potential negligence.

■ Generally, parties "not engaged in public service may properly bargain against liability for harm caused by their ordinary negligence in performance of contractual duty; but such an exemption is always invalid if it applies to harm wilfully inflicted or caused by gross or wanton negligence." 6A Arthur L. Corbin, *Corbin on Contracts* § 1472, at 596–97 (1962). Contractual provisions releasing parties from potential negligence usually fall into one of three genre.

■ First, parties may contract to release a party from potential liability after injuries have occurred. These kinds of release provisions typically are found in insurance settlement agreements. Utah courts have held that such releases are valid when their language is unambiguous and unequivocal. *See, e.g., Simonson v. Travis,* 728 P.2d 999, 1002 (Utah 1986) (observing releases are enforceable when they are unambiguous, explicit, and unequivocal); *Krauss v. Utah State Dep't of Transp.,* 852 P.2d 1014, 1020 (Utah App.) (observing court first must assess whether release's language is unambiguous), *cert. denied,* 862 P.2d 1356 (Utah 1993); *Palmer v. Davis,* 808 P.2d 128, 132 (Utah App.) (observing interpretation of releases may begin and end with four corners of document when language is unambiguous), *cert. denied,* 817 P.2d 327 (Utah 1991).

■ Second, parties may contract to shift potential liability from one party to another. Such indemnity provisions are designed to allocate fairly the risk of loss or injury resulting from a particular venture between the parties. Utah courts have held that indemnity agreements, like releases, are valid only if the contract language clearly and unequivocally expresses the parties' intent to indemnify one another. *See, e.g., Freund v. Utah Power & Light Co.,* 793 P.2d 362, 371–72 (Utah 1990) (upholding indemni-

ty provision whose language clearly and unequivocally expressed licensee's intent to indemnify licensor). Historically, Utah courts applied a strict construction rule for indemnity provisions. *See Shell Oil Co. v. Brinkerhoff–Signal Drilling Co.*, 658 P.2d 1187, 1189 (Utah 1983); *Union Pac. R.R. v. Intermountain Farmers Ass'n*, 568 P.2d 724, 725–26 (Utah 1977); *Howe Rents Corp. v. Worthen*, 18 Utah 2d 263, 265, 420 P.2d 848, 849 (1966); *Union Pac. R.R. v. El Paso Natural Gas Co.*, 17 Utah 2d 255, 260, 408 P.2d 910, 913–14 (1965); *Jankele v. Texas Co.*, 88 Utah 325, 329–30, 54 P.2d 425, 427 (1936). However, the Utah Supreme Court has relaxed the rule of strict construction and adopted a more lenient clear and unequivocal test for enforcing indemnity agreements. *Freund*, 793 P.2d at 370–71; *see also Pickhover v. Smith's Management Corp.*, 771 P.2d 664, 667–68 (Utah App.1989) (discussing trend to limit rule of strict construction for indemnity agreements), *cert. denied*, 795 P.2d 1138 (Utah 1990).

■ Third, parties may contract to avoid a party's potential liability before injuries have occurred. Often described as exculpatory clauses, such provisions relieve one party from the risk of loss or injury in a particular transaction or occurrence and deprive the other party of the right to recover damages for loss or injury. Such exculpatory or hold harmless provisions may release parties from liability for their ordinary negligence. The instant hold harmless provision represents this third genre. Although Utah courts have not yet addressed hold harmless provisions exactly like the one before us, Utah courts have previously addressed contractual provisions limiting a party's remedy. They have applied the same clear and unequivocal standard for enforcing such clauses as that employed when enforcing release and indemnity provisions. *See, e.g., DCR Inc. v. Peak Alarm Co.*, 663 P.2d 433, 438 (Utah 1983) (requiring clear and unequivocal expression of intent limiting tort liability to enforce liquidated damages clause); *DuBois v. Nye*, 584 P.2d 823, 824–25 (Utah 1978) (observing risk of loss agreement must be construed to give effect to parties' intent).

■ Utah courts thus apply the same test to contracts that release, shift, or avoid potential liability for negligence. When the intent to relieve a party from liability for alleged negligence is clearly and unequivocally expressed in a contractual provision, we will enforce that provision. *Freund*, 793 P.2d at 370. Utah's rule for enforcing release, indemnity, and exculpatory agreements has been articulated as follows:

> [T]o constitute a clear and unequivocal expression of intent to indemnify for a party's own negligence, an indemnity agreement need not contain specific language to that effect; rather, the language and purpose of the entire agreement, together with the surrounding facts and circumstances, may provide a sufficiently clear and unequivocal expression of the parties' intent.

*Healey v. J.B. Sheet Metal, Inc.*, 892 P.2d 1047, 1049 (Utah App.1995). In other words, " 'it is not necessary that the exculpatory language refers expressly to the negligence of the indemnitee, so long as the intention to indemnify can be "clearly implied from the language and purposes of the entire agreement." ' " *Freund*, 793 P.2d at 370 (quoting *Niagara Frontier Transp. Auth. v. Tri–Delta Constr. Corp.*, 107 A.D.2d 450, 487 N.Y.S.2d 428, 430 (1985) (quoting *Margolin v. New York Life Ins. Co.*, 32 N.Y.2d 149, 344 N.Y.S.2d 336, 338, 297 N.E.2d 80, 82 (1973))). Although this rule has developed in the context of indemnity agreements, it applies with equal force to releases and exculpatory or hold harmless agreements.

■ The instant hold harmless provision does not include the word "negligence," and Russ contends that the provision therefore is not sufficiently clear to bar his negligence claim. The *Freund* court made clear that the word "negligence" is not a talisman to enforce contracts avoiding potential liability. *Id.* A hold harmless provision is enforceable when "the broad sweep of the language employed by the parties clearly covers those instances in which [a party] may be negligent." *Id.* at 371.

■ The *Freund* court held that language releasing an indemnitee from "any claims for damages to property and injury or

death" constituted a sufficiently clear and unequivocal expression to release liability for alleged negligence. *Id.* Similarly, the instant provision holds Woodside harmless for "any and all claims, damages, loss and expenses." The instant provision also holds Woodside harmless "to the fullest extent permitted by law." Moreover, the provision holds Woodside harmless for "any death, accident, injury, or other occurrence resulting from visits to the job site." The broad sweep of the provision's language clearly and unequivocally establishes the parties' intent to avoid Woodside's potential liability arising from the Russes' loss or injury incurred during job site visits. Thus, the instant hold harmless provision meets the test of enforceability and bars Russ's negligence action.[1]

In sum, Utah courts review hold harmless provisions under the same clear and unequivocal test that they apply to releases and indemnity agreements. The language of such provisions must clearly and unequivo-

cally express the parties' intent to release, shift, or avoid potential liability for loss or injury resulting from particular transactions or occurrences. That language need not include the word "negligence." Therefore, the trial court correctly held that the instant provision clearly and unequivocally bars Russ's negligence claim against Woodside.

## II. The Hold Harmless Provision and Public Policy

■ Russ argues that because the hold harmless provision avoids Woodside's potential liability for personal injury, the provision violates public policy and thus is rendered void.[2] Woodside responds that the hold harmless provision articulates sound public policy because it gives notice of dangerous conditions on a job site and places risks attendant to job site visits squarely on home buyers.

■ Russ first urges us to conclude that Woodside is a public servant and thus

**1.** Russ also claims that the contract is unenforceable because the Russes did not fully understand the import of the hold harmless provision. Russ, however, acknowledges that he and his wife signed the contract. Under Utah law, "a signatory cannot, with hindsight, claim ignorance of the contract and thereby escape liability." *Western Properties v. Southern Utah Aviation, Inc.*, 776 P.2d 656, 658 (Utah App.1989). It is well established that

> [o]ne party to a contract does not have a duty to ensure that the other has a complete and accurate understanding of all terms embodied in a written contract. Each party has the burden to understand the terms of a contract before he affixes his signature to it and may not thereafter assert his ignorance as a defense.

*Resource Management Co. v. Weston Ranch & Livestock Co.*, 706 P.2d 1028, 1047 (Utah 1985) (citation omitted). In other words, Woodside is not required to show that the Russes understood the hold harmless provision before it asserts the provision's protection. In Utah, contracts mean what they say, and parties will be bound by them.

In addition, at several points in his brief, Russ describes the instant contract as an adhesion contract. We disagree. A contract of adhesion is an agreement forced on one party by another, who has superior bargaining strength. *Wagner v. Farmers Ins. Exch.*, 786 P.2d 763, 766 n. 2 (Utah App.1990), *overruled on other grounds, Allen v. Prudential Property and Cas. Ins. Co.*, 839 P.2d 798 (Utah 1992). In other words, an adhesion contract is one in which the party has no alternative. Russ concedes that he and his wife were

not forced to contract with Woodside. Moreover, simply because "the terms of a contract are embodied in written form developed by one of the parties does not automatically render it either a contract of adhesion or unenforceable." *Resource Management*, 706 P.2d at 1048.

**2.** At oral argument, Russ's counsel pointed to Utah Code Ann. § 13–8–1 (1992) as an articulation of public policy with regard to the present hold harmless provision. Section 13–8–1 provides in relevant part:

> A covenant, promise, agreement or understanding in, or in connection with or collateral to, a contract or agreement relative to the construction, alteration, repair or maintenance of a building ... purporting to indemnify the promisee against liability for damages arising out of bodily injury to persons or damage to property caused by or resulting from the *sole negligence of the promisee*, his agents or employees, or indemnitee, is against public policy and is void and unenforceable.

*Id.* (emphasis added). Thus, "an indemnity agreement in the construction industry violates public policy if it requires indemnification of the indemnitee for its sole negligence." *Jacobsen Constr. Co. v. Blaine Constr. Co.*, 863 P.2d 1329, 1331 (Utah App.1993). Russ's counsel conceded at oral argument that Russ's claim did not arise from Woodside's sole negligence. Additionally, the hold harmless provision at issue is not an indemnity agreement between contractor and subcontractor. Accordingly, we conclude that section 13–8–1 does not apply to the present dispute.

unable to avoid its potential liability by contract. Generally, public servants may not contract to escape potential liabilities for their ordinary negligence. *See* 6A Arthur L. Corbin, *Corbin on Contracts* § 1472, at 591–92 (1962 & Supp.1994). Relying on *Krohnert v. Yacht Sys. Hawaii, Inc.,* 4 Haw.App. 190, 664 P.2d 738 (1983), Russ offers a six-factor test for determining whether a party is a public servant. The *Krohnert* factors actually define public interest generally rather than public servants specifically. *Id.,* 664 P.2d at 744 (citing *Lynch v. Santa Fe Nat'l Bank,* 97 N.M. 554, 558, 627 P.2d 1247, 1251–52 (1981)). For this reason and because we conclude as a matter of law that Woodside is not a public servant, we decline even to discuss the *Krohnert* factors.

In our view, it is clear that Woodside is not a public servant. Traditionally, public servants are state agencies, utilities, innkeepers, common carriers, and public warehousers. *See Tunkl v. Regents of Univ. of Cal.,* 60 Cal.2d 92, 32 Cal.Rptr. 33, 37 n. 12, 383 P.2d 441, 445 n. 12 (1963). Public servants are those who are duty bound to contract with all comers. While Woodside does contract with some home buyers, it has no obligation to contract with every home buyer. Public servants are persons and entities that provide essential and indispensable services such as hospital care and police protection. *See id.,* 32 Cal.Rptr. at 39, 383 P.2d at 447 (discussing essential nature of hospital services); *Schrier v. Beltway Alarm Co.,* 73 Md.App. 281, 533 A.2d 1316, 1323 (1987) (contrasting alarm company's services with essential nature of police services). Woodside's service of building houses for private parties cannot be described as an essential public service. Consequently, Woodside is not a public servant.

When determining whether a contract provision offends public policy, we look to the provision's context, subject, and overall purpose. *See Retherford v. AT & T Communications, Inc.,* 844 P.2d 949, 967 n. 11 (Utah 1992). The hold harmless provision is part of Woodside's notice to home buyers about construction site dangers. The provision ensures that buyers are aware of the construction site's inherent risks. From this view, the provision serves the same purpose as warning signs such as "Hard Hat Area," "Men at Work," and "Road Construction Ahead." It places buyers on notice of the risks attendant to job site visits.

Realities of the construction industry make it impossible for general contractors to make construction sites completely safe during or at the end of each working day. Builders and others involved in the construction trade are governed by significant and specific state regulations. *See* Utah Code Ann. §§ 58–55–101 to –604 (Supp.1995); *id.* §§ 58–56–1 to –17 (1994 & Supp.1995). In addition, builders have a legal duty to complete construction in a good and workmanlike manner. *See Good v. Christensen,* 527 P.2d 223, 224 (Utah 1974). Builders cannot, by contract, exculpate themselves from potential liability for shoddy workmanship, building code violations, negligent construction, or other liabilities arising from their finished product. Nevertheless, while a builder's work is in progress, construction sites present inherent risks. Builders and buyers may contract to place potential liability for those risks on one of the parties.

In sum, Woodside is not a public servant and thus is not barred from avoiding potential liability by contract. Moreover, the hold harmless provision in the agreement to commence construction does not violate public policy. The trial court therefore correctly concluded that the hold harmless provision covers Russ's claim and correctly granted Woodside's motion for summary judgment.

### CONCLUSION

We hold that the contractual provision holding Woodside harmless for injuries arising from job site visits is clear and unequivocal; therefore, it meets the test of enforceability. Moreover, we hold that the provision does not violate public policy. Accordingly, we affirm the trial court's grant of summary judgment.

BILLINGS and GREENWOOD, JJ., concur.