2001 UT 94

**Jessica HAWKINS, by and through her guardians, Brian and Melinda HAWKINS, Plaintiff, Appellant, and Cross–Appellee,**

v.

**Blair PEART, dba Navajo Trails, Defendant, Appellee, and Cross–Appellant.**

No. 20000562.

Supreme Court of Utah.

Oct. 30, 2001.

Rehearing Denied Jan. 9, 2002.

Brian S. King, Salt Lake City, for plaintiff.

James W. Jensen, Matthew T. Graff, Salt Lake City, for defendant.

DURRANT, Justice:

¶ 1 Defendant Navajo Trails required plaintiff Jessica Hawkins's mother to sign a release form prior to allowing Hawkins to ride one of its horses. The release form contained a waiver of liability and an indemnity provision. The district court invalidated the waiver provision on public policy grounds, but upheld the indemnity provision. Hawkins appeals the district court's decision upholding the indemnity clause, and Navajo Trails cross-appeals the court's invalidation of the waiver provision. We conclude that

both the waiver provision and the indemnity provision are invalid. Thus, we affirm the district court's ruling as to the release provision, but reverse as to the indemnity provision.

## BACKGROUND

¶ 2 In July 1997, eleven-year-old Hawkins went to Duck Creek, Utah, for a family reunion. As part of the reunion, members of the family arranged for Navajo Trails to provide horses and guides for a trail ride. As a condition of its service, Navajo Trails required Hawkins's mother to sign a "Release Form." In pertinent part, that form stated as follows:

> Riding and handling horses can be DANGEROUS. This form must be completed and signed before you can ride .... By signing this form, you agree to ASSUME THE RISK of any injury, death, or loss, or damage which you or your child ... may suffer .... In consideration for the rendering of trail riding ... service by Navajo Trails ... [t]he undersigned on behalf of himself or for any person for whom he or she is a parent or legal guardian, does hereby indemnify (reimburse), release, and forever hold harmless, Navajo Trails ... [for] any claims, demands, and actions or causes of action on account of death or injury or loss or damage which may occur from any cause, without regard to negligence, other than the gross negligence or willful misconduct of Navajo Trails .... If the undersigned is a parent or guardian, he or she further agrees to indemnify (reimburse) Navajo Trails or such persons for any damages paid by or assessed against Navajo Trails ... as a result of injury to or death of a child....

Hawkins's mother signed this form.[1]

¶ 3 During the trail ride, Hawkins's horse was spooked and threw her. Hawkins was injured. She filed suit against Navajo Trails, alleging that it had provided an insufficient number of guides, that its guides were

---

1. Additionally, the form apparently contained spaces for the parent or guardian to list children going on the trip. Hawkins's brief asserts that Hawkins's mother "intentionally omitted the names of her children because she did not want the language in the Release Form to cover any of them." The district court based its decision on policy grounds and did not consider this allegation. It has not been addressed further by either party on appeal.

not adequately trained, and that its guides had failed to carry out properly their duties during the ride. In response, Navajo Trails denied that it was negligent and additionally defended on the ground that the "Release Form" precluded Hawkins's suit. Both parties moved for summary judgment on the issues of the legal effect and enforceability of the Release Form. The district court ruled that the indemnity provision was enforceable between Hawkins's mother and Navajo Trails but that the release of Hawkins's future claims for negligence was unenforceable as a matter of public policy. Hawkins appealed the indemnity ruling, and Navajo Trails cross-appealed the ruling as to the release.[2]

## ANALYSIS

■ ¶ 4 We review the lower court's contractual interpretation of the release form for correctness, affording the district court no deference. *See Aquagen Int'l, Inc. v. Calrae Trust,* 972 P.2d 411, 413 (Utah 1998).

¶ 5 In assessing the validity of the release, the district court referred to *Russ v. Woodside,* 905 P.2d 901, 905 (Utah Ct.App.1995). *Russ* described three general circumstances in which parties may obtain contractual releases from liability for negligent action: (1) where injuries have already occurred and one party releases the other from liability for those injuries, (2) where one party agrees to indemnify for liability for future injuries, and (3) where one party agrees to release the other from liability for future injuries. *See Russ,* 905 P.2d at 904–05. The second and third categories require a clear and unequivocal expression of the intent to indemnify or release according to *Russ. See id.*

¶ 6 The district court concluded that the contractual language of the indemnity and the release provisions was clear and unequivocal as a matter of law. Accordingly, it held that, because the indemnity provision constituted a contract between an adult and a business, it was enforceable according to the

general rule permitting such agreements. However, with respect to the release, the court held that the general rule permitting release of liability did not apply where a parent signs the contract on behalf of a minor.

¶ 7 The court arrived at its decision by articulating a public policy for refusing to recognize contracts releasing individuals or entities from liability for future injuries to minors. In the absence of controlling statutes or case law, the court consulted general statements of policy found in statutes detailing the rights of minors and the responsibilities of guardians. The court referred to sections 15-2-2, 75-5-103, and 75-5-209 of the Utah Code, and rule 17 of the Utah Rules of Civil Procedure. Those provisions pertain, respectively, to a minor's ability to disaffirm contracts prior to attaining the age of majority, the power of a parent to delegate fundamental care and supervision responsibilities over a minor to another, the general powers of guardians of a minor, and the necessity of guardians or guardians ad litem when minors appear as parties to court proceedings. The court concluded that these provisions indicated a general protective intent that, on balance, militated in favor of precluding parents from contractually releasing others from liability for injuring minors.

¶ 8 On appeal, Hawkins defends the district court's distinction between contracts involving adults and contracts where a guardian releases another from liability for harm to a minor. Alternatively, Hawkins argues that the general rule permitting releases does not apply in this case. We will first address the general rule and then discuss the district court's application of a public policy exception to circumstances involving minors.

¶ 9 The rule regarding releases, to which the district court and *Russ* referred, is stated as a general principle of the common law in 6A Arthur Linton Corbin, *Corbin on Contracts,* § 1472, at 596–97 (1962):

---

2. The district court certified its order as a final appealable order pursuant to rule 54(b) of the Utah Rules of Civil Procedure. However, this court determined that the district court erred in so doing because the issues still pending were based on substantially the same operative facts as the issues certified as final. *See Kennecott*

*Corp. v. Utah State Tax Comm'n,* 814 P.2d 1099, 1101–04 (Utah 1991). It was therefore an interlocutory order and not a final order. This court nonetheless agreed to exercise its discretion under rule 5(a) of the Utah Rules of Appellate Procedure to hear the appeal and cross-appeal of that order.

It is generally held that those who are not engaged in public service may properly bargain against liability for harm caused by their ordinary negligence in performance of contractual duty; but such an exemption is always invalid if it applies to harm wilfully inflicted or caused by gross or wanton negligence.

(Footnote omitted.) Thus, most courts allow release of liability for prospective negligence, except where there is a strong public interest in the services provided. *But see Hiett v. Lake Barcroft Cmty. Ass'n,* 244 Va. 191, 418 S.E.2d 894, 896–97 (1992) (invalidating all pre-injury releases as violative of public policy). Some courts have attempted to establish a more detailed list of criteria for determining public policy limitations on releases. Many states rely on the standards propounded in *Tunkl v. Regents of the University of California,* 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441, 445–46 (1963), or *Jones v. Dressel,* 623 P.2d 370, 376 (Colo.1981).[3] *See, e.g., Porubiansky v. Emory Univ.,* 156 Ga.App. 602, 275 S.E.2d 163, 167–68 (1980) (adopting *Tunkl* ); *Olson v. Molzen,* 558 S.W.2d 429, 431 (Tenn.1977) (same); *Wagenblast v. Odessa Sch. Dist.,* 110 Wash.2d 845, 758 P.2d 968, 971 (1988) (same); *Kyriazis v. Univ. of W. Va.,* 192 W.Va. 60, 450 S.E.2d 649, 654–55 (1994) (same); *Milligan v. Big Valley Corp.,* 754 P.2d 1063, 1066 (Wyo.1988) (noting earlier adoption of *Jones* ); *cf. Dalury v. S–K–I, Ltd.,* 164 Vt. 329, 670 A.2d 795, 797–99 (1995) (noting existence of standards, but adopting ad hoc totality of the circumstances approach).

■ ¶ 10 *Tunkl* and *Jones* set forth standards for determining whether the public interest in the activity at issue warrants an exception to the general rule allowing releases. However, we need not reach the question of whether to adopt the *Tunkl* or *Jones* standard, or any other standard generally relating to the public interest exception, because, in deciding the case before us, we rely on a public policy exception specifically relating to releases of a minor's claims. A clear majority of courts treating the issue have held that a parent may not release a minor's prospective claim for negligence. *See, e.g., Fedor v. Mauwehu Council, Boy Scouts of Am.,* 21 Conn.Supp. 38, 143 A.2d 466, 467–68 (1958); *Meyer v. Naperville Manner, Inc.,* 262 Ill.App.3d 141, 199 Ill.Dec. 572, 634 N.E.2d 411, 414–15 (1994); *Doyle v. Bowdoin Coll.,* 403 A.2d 1206, 1208 n. 3 (Me.1979); *Fitzgerald v. Newark Morning Ledger Co.,* 111 N.J.Super. 104, 267 A.2d 557, 558–59 (1970); *Childress v. Madison County,* 777 S.W.2d 1, 6–7 (Tenn.Ct.App.1989); *Munoz v. II Jaz Inc.,* 863 S.W.2d 207, 209–10 (Tex.App. 1993); *Scott v. Pac. W. Mountain Resort,* 119 Wash.2d 484, 834 P.2d 6, 10–12 (1992). The rationale employed by these courts is aptly summarized in the Washington Supreme Court's holding in *Scott.* As stated by that case, "Courts often hold that in a postinjury setting a parent's signature on a release is ineffective to bar a minor's claims against a

---

**3.** Those standards are as follows:

[T]he attempted but invalid exemption involves a transaction which exhibits some or all of the following characteristics. [1] It concerns a business of a type generally thought suitable for public regulation. [2] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. [3] The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.

*Tunkl v. Regents of Univ. of California,* 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441, 445–46 (1963) (footnotes omitted).

In determining whether an exculpatory agreement is valid, there are four factors which a court must consider: (1) the existence of a duty to the public; (2) the nature of the service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the parties is expressed in clear and unambiguous language.

*Jones v. Dressel,* 623 P.2d 370, 376 (Colo.1981). *Jones* additionally referenced the *Tunkl* standard for determining "the existence of a duty to the public." *Id.*

negligent party." *Scott*, 834 P.2d at 11; *see also* 59 Am.Jur.2d, *Parent and Child* § 40, at 183 (1987) (noting that, absent court appointment, parents have no authority to release or compromise claims or causes of action belonging to minors). Based on this premise, *Scott* reasoned that "[s]ince a parent generally may not release a child's cause of action after injury, it makes little, if any, sense to conclude a parent has authority to release a child's cause of action prior to an injury." 834 P.2d at 11–12.

¶ 11 We agree. First, Utah law is consistent with *Scott's* underlying premise. Navajo Trails has cited no source of law, and we are aware of none, granting parents in Utah a general unilateral right to compromise or release a child's existing causes of action without court approval or appointment to that effect. To the contrary, Utah law provides various checks on parental authority to ensure a child's interests are protected. Under the Uniform Probate Code, for example, when a minor has a cause of action, the minor or another person interested in the minor's welfare may petition for the appointment of a conservator. *See* Utah Code Ann. § 75–5–404 (1993). Once appointed, a conservator "may act without court authorization or confirmation" to "settle a claim by or against the ... protected [minor] by compromise, arbitration, or otherwise." *Id.* § 75–5–424(3), (3)(s) (1993); *see also id.* § 75–5–409(1) (1993) (allowing court to authorize, direct, or ratify transactions to protect the minor's interests when the situation does not require a full conservatorship). Significantly, a parent may act as a minor's conservator, not as a matter of right, but only when appointed by the court. *See* Utah Code Ann. § 75–5–410(1) (Supp.2000) (listing parents seventh in prioritized list of those eligible for court appointment as a conservator).

¶ 12 Moreover, the statutes and rules cited by the district court in this case are also indicative of public policies favoring protection of minors with respect to contractual obligations. Specifically, section 15–2–2 of the Utah Code provides that minors may disaffirm contracts "before or within a reasonable time after ... majority...." Utah

Code Ann. § 15–2–2 (1999). Furthermore, rule 17(b) of the Utah Rules of Civil Procedure provides that a "minor ... who is a party [to any civil action] must appear either by a general guardian or by a guardian ad litem appointed in the particular case by the court in which the action is pending."[4] Utah R. Civ. P. 17(b).

¶ 13 Having thus agreed with *Scott's* premise that a parent may not unilaterally release a child's claims *after* a child's injury, we also agree with *Scott's* conclusion that a parent does not have the authority to release a child's claims *before* an injury. As in *Scott*, we see little reason to base the validity of a parent's contractual release of a minor's claim on the timing of an injury. Indeed, the law generally treats preinjury releases or indemnity provisions with greater suspicion than postinjury releases. *See Shell Oil Co. v. Brinkerhoff–Signal Drilling Co.*, 658 P.2d 1187, 1189 (Utah 1983). An exculpatory clause that relieves a party from future liability may remove an important incentive to act with reasonable care. These clauses are also routinely imposed in a unilateral manner without any genuine bargaining or opportunity to pay a fee for insurance. The party demanding adherence to an exculpatory clause simply evades the necessity of liability coverage and then shifts the full burden of risk of harm to the other party. Compromise of an existing claim, however, relates to negligence that has already taken place and is subject to measurable damages. Such releases involve actual negotiations concerning ascertained rights and liabilities. Thus, if anything, the policies relating to restrictions on a parent's right to compromise an existing claim apply with even greater force in the preinjury, exculpatory clause scenario. We therefore adopt the majority posture on this question and affirm the district court.

¶ 14 Turning now to the indemnity question, we conclude that the trial court erred in holding valid the indemnity provision in the form contract provided by Navajo Trails. In general, the common law disfa-

---

4. The court also cited sections 75–5–103 and 75–5–209 of Utah's Uniform Probate Code. While these sections deal generally with the powers and responsibilities of parents or guardians, we do not find them particularly pertinent to the issues raised by this case.

vors agreements that indemnify parties against their own negligence because "one might be careless of another's life and limb, if there is no penalty for carelessness." *Hyde v. Chevron U.S.A.,* 697 F.2d 614, 632 (5th. Cir.1983). Because of this public safety concern, we strictly construe indemnity agreements against negligence. *See Union Pac. R.R. v. Intermountain Farmers Ass'n,* 568 P.2d 724, 726 (Utah 1977) (holding that although the intent of the parties governs indemnity agreements against negligence, "the presumption is against any such intention and it is not achieved by inference from general language").

¶ 15 In rejecting parental indemnifications, a few courts have relied on the strict standards of clarity required of indemnity provisions generally, thereby avoiding the issue of whether public policy completely forbids agreements that shift financial responsibility from the negligent party to the parents of an injured minor. *See, e.g., O'Connell v. Walt Disney World Co.,* 413 So.2d 444, 447 (Fla. Dist.Ct.App.1982) (finding it unnecessary to decide whether public policy permits a parent to indemnify an amusement park against negligence in conducting a horseback ride, since the contractual language did not clearly show an intent to indemnify).

¶ 16 In the case at hand, however, it is undisputed that the indemnity agreement is clear and unequivocal. We therefore must decide whether enforcement of the agreement violates public policy in light of our newly announced rule voiding parental waivers. We conclude that it does. Having now adopted a rule intended to preserve a minor's right to recover damages caused by another's negligence, we cannot uphold an agreement that shifts the source of compensation from the negligent party to the minor's parent. Such an agreement creates an unacceptable conflict of interest between a parent and a minor, as perceptively noted by the New York Court of Appeals:

> [W]e are extremely wary of a transaction that puts parent and child at cross-purposes and ... tends to quiet the legitimate complaint of the minor child. Generally, we may regard the parent's contract of indemnity ... as an instrument that motivates him to discourage the proper prosecution of the infant's claim .... The end

result is either the outright thwarting of our protective policy, or, should the infant ultimately elect to ignore the settlement and to press his claim, disharmony within the family unit. Whatever the outcome, the policy of the State suffers.

*Valdimer v. Mount Vernon Hebrew Camps, Inc.,* 9 N.Y.2d 21, 210 N.Y.S.2d 520, 172 N.E.2d 283, 285 (1961); *see also Ohio Cas. Ins. Co. v. Mallison,* 223 Or. 406, 354 P.2d 800, 802–06 (1960) (noting that a child would be unlikely to pursue claims if agreement required its parent to indemnify the defendant). In short, an indemnification from negligence that specifically makes a parent the ultimate source of compensation would likely result in inadequate compensation for the minor or family discord.

¶ 17 In addition, the indemnity agreement at issue is inconsistent with a parent's duty to a child. Specifically, where a parent has a duty to protect the best interests of a child, an agreement to insure a third party against any consequences for that third party's negligent behavior toward the child can only serve to undermine the parent's fundamental obligations to the child. *See Ohio Cas. Ins. Co.,* 354 P.2d at 802 (voiding an indemnity provision in a settlement agreement in part because a parent's duty to act "for the benefit of his child" is "not fully discharged where the parent enters into a bargain which gives rise to conflicting interests.").

¶ 18 Based on similar policy judgments, several other jurisdictions have invalidated agreements that required parents to indemnify a party against negligent acts that injure the parent's child. *See generally Valdimer,* 210 N.Y.S.2d 520, 172 N.E.2d at 285; *Ohio Cas. Ins. Co.,* 354 P.2d at 804; *Childress v. Madison Cty.,* 777 S.W.2d 1, 7 (Tenn.Ct.App. 1989). We, too, conclude that public policy renders void the indemnity agreement between Navajo Trails and Hawkins's mother. By shifting financial responsibility to a minor's parent, such indemnity provisions would allow negligent parties to circumvent our newly adopted rule voiding waivers signed on behalf of a minor. Although the indemnity contract theoretically binds only Hawkins's mother, as a practical matter, it could chill Hawkins's pursuit of her legal

claims against Navajo Trails since her mother, not Navajo Trails, would be the ultimate source of compensation.

¶ 19 We affirm the court's ruling with respect to the waiver of liability, but reverse with respect to the indemnity provision. We remand for further proceedings consistent with this opinion.

¶ 20 Chief Justice HOWE, Associate Chief Justice RUSSON, Justice DURHAM, and Justice WILKINS concur in Justice DURRANT's opinion.