141 P.3d 459

STANFORD CARR DEVELOPMENT CORPORATION, a Hawai'i corporation, SCD Ewa Corporation, a Hawai'i corporation; and Stanford S. Carr, Plaintiffs–Appellants, Cross–Appellees,

v.

UNITY HOUSE, INCORPORATED, a Hawai'i non-profit corporation, and Hale Lokahi, Ltd., a Hawai'i for-profit corporation, Defendants–Appellees, Cross–Appellants,

and

John Does 1–10, Jane Does 1–10, Doe Corporations 1–10, Doe Non–Profit Corporations 1–10, Doe Partnerships 1–10, and Doe Governmental Entities 1–10, Defendants.

Hale Lokahi, Ltd., a Hawai'i corporation, Plaintiff–Appellee, Cross–Appellant,

v.

SCD Ewa Corporation, a Hawai'i corporation, Stanford S. Carr Development Corporation, a Hawai'i corporation, and Stanford Shigeo Carr, Defendants–Appellants, Cross–Appellees,

v.

Hale Lokahi, Ltd., a Hawai'i corporation, Counterclaim Defendant–Appellee, Cross–Appellant,

and

Unity House, Incorporated, a Hawai'i non-profit corporation, Hale Lokahi, Ltd., a Hawai'i for-profit corporation, Innovative Financial Services, Inc., a Hawai'i for-profit corporation, Additional Counterclaim Defendants–Appellees, Cross–Appellants,

and

John Does 1–10, Jane Does 1–10, Doe Corporations 1–10, Doe Non–Profit Corporations 1–10, Doe Partnerships 1–10, and Doe Governmental Entities 1–10, Additional Counterclaim Defendants.

No. 26906.

Supreme Court of Hawai'i.

Aug. 17, 2006.

Harvey J. Lung, Honolulu, Bruce D. Voss, and Amara Harrell (of Bays, Deaver, Lung, Rose & Baba), on the briefs, for plaintiffs-appellants/cross-appellees and defendants-appellants/ cross-appellees SCD Ewa Corporation, Stanford S. Carr Development Corporation, and Stanford Shigeo Carr.

Howard Glickstein and David J. Gierlach, Honolulu, on the briefs, for defendant-appellee/cross-appellant Unity House Incorporated and defendant-appellee/cross-appellant and plaintiff-appellee/cross-appellant Hale Lokahi, Ltd.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by DUFFY, J.

Plaintiffs–Appellants/Cross–Appellees and Defendants–Appellants/Cross–Appellees Stanford Carr Development Corporation, SCD Ewa Corporation, and Stanford S. Carr [hereinafter, collectively, SCD] appeal, and Defendant–Appellee/Cross–Appellant Unity House, Incorporated [hereinafter, UH] and Defendant–Appellee/Cross–Appellant and Plaintiff–Appellee/Cross–Appellant Hale Lokahi, Ltd. [hereinafter, HL, and collectively with UH, UH/HL] cross appeal, from the September 22, 2004 amended final judgment of the Circuit Court of the First Circuit.[1]

SCD contends that the circuit court erred in: (1) granting UH/HL's Motion For Partial Summary Judgment; and (2) denying SCD's "Motion For Determination That Plaintiffs' Right to Recover Damages Under The May 16, 2003 Jury Award Is Not Limited By That Certain December 9, 1998 'Agreement' " filed July 24, 2003. In their cross-appeal, UH/HL assert that the circuit court: (1) erred in submitting the issue of partnership liability to the jury, thereby prejudicing the jury's verdict in favor of SCD on HL's breach of contract claim; (2) erred in denying UH/HL's motion for judgment as a matter of law; (3) abused its discretion in refusing to grant a new trial; (4) abused its discretion in awarding attorneys' fees and costs to SCD; and (5) erred in refusing to give UH/HL's jury instructions. Based on the following, we affirm the circuit court's September 22, 2004 amended final judgment in part and reverse in part with respect to Count XIII (Partnership Liability).

## I. BACKGROUND

### A. Factual Background

At trial, Carr, a real estate developer, testified that in early 1995, UH approached him about developing an affordable housing program for UH union members. Before any contracts had been signed, Carr put $250,000 down to purchase 232 lots for the project from Gentry Homes. According to the initial plan: (1) Union Yes Financial would provide financing to purchase all 232 lots; (2) UH would provide a $5 million revolving line of credit to build the homes; and (3) Carr would arrange for North American Mortgage Company (NAMCO) to provide financing to the prospective home buyers through NAMCO's community lending program, which provides a silent second mortgage to low income buyers allowing them to make lower down payments on a home.[2]

On or about September 9, 1995, Carr received a Due Diligence Report from Mike Scarfone, a consultant commissioned by UH to do due diligence in underwriting the acquisition of the lots. The report stated that SCD "requested the participation of a financial partner and has provided a proposal to [UH] to provide a 5.0 million dollar equity

---

1. The Honorable Virginia Lea Crandall presided over this matter.

2. The silent second mortgage program was a down payment assistance program that would

have allowed lower income buyers to qualify for homes that they would not have otherwise been able to qualify for without the program.

contribution for 2 years for the purchase of 232 improved sub divided [sic] lots." The report further stated that the proposal would "[p]rovide a 50% return over 2 years[ ] on the [UH] equity participation of 5,000,000 dollars."

Union Yes Financial, however, subsequently withdrew its approval to finance the land acquisition and the project was downsized to eighty-four lots. On November 2, 1995, Carr submitted a revised proposal to UH for an eighty-four-lot project called Trovare [hereinafter, the Trovare Project]. Carr's revised proposal stated that "[t]he difference in profit for [UH] would be accordingly:.... Profit $1.5 million[.]" Additionally, Carr prepared a "Summary of Significant Points for Loan Package," which provided for a $3.6 million loan at an interest rate of "[p]rime rate plus two percent[.]" A separate section labeled "Equity Participation" stated: "50% participation of project profits, estimated at approximately $3 million." Attached to the Summary of Significant Points was an "Executive Summary" which stated that SCD was "seeking a $3.6 million equity contribution for one and a half to two years, for the purpose of 84 improved subdivided lots in Ewa, Oahu, Hawaii." It further stated that "[i]n consideration of the equity contribution, SCDC offers a fifty percent (50%) participation in the profits of the development which is [sic] projected to be approximately $2.9 million."

In response to Carr's November 2, 1995 proposal, UH offered a counterproposal dated November 8, 1995, in which UH reduced the amount from $3.6 million to $3 million, demanded first preference exclusivity on the purchase of all eighty-four homes, and labeled the $1.5 million a "release fee," which was to be "paid to Unity House prior to any profit distributions to SCDC." Carr accepted and executed the counterproposal. In order to finance the balance of $600,000, Carr entered into a loan agreement with Financial Consulting Group, Inc. and Pflueger Properties [hereinafter, Financial/Pflueger].

UH subsequently sent Carr a loan commitment setting forth the terms of a $3 million loan from HL, UH's wholly owned subsidiary, to SCD and a letter stating the obligations of the parties, both of which Carr

signed. The loan commitment, prepared by HL, provided, *inter alia,* that HL's loan was junior to a loan from the first lien holder, General Electric Capital Hawaii (GECH), which had provided SCD a $4 million land acquisition loan and a revolving construction loan of $3.1 million. The loan commitment additionally stated that "[t]his commitment supersedes any oral or written discussion prior to the date of this commitment letter." The letter, provided by UH, stated, *inter alia,* that in return for assuring Carr buyers for "one or more" of the lots, Carr agreed to: (1) set aside eighty-four houses for UH members on a first priority basis; (2) obtain UH's consent before changing sales prices; (3) provide a 5% unsecured loan to qualified buyers; (4) provide UH with marketing brochures and model homes; (5) provide UH with sales materials, including sales contracts; and (6) agree to a sixty-day exclusivity period for sales to UH members. On or about December 13, 1995, Carr signed the promissory note in favor of HL for $3 million [hereinafter, HL Note or Note] and the accompanying loan agreement. The loan was secured by a mortgage on the lots. The principal balance and $1.5 million release fee were due in full on or before December 15, 1997, regardless of whether the Trovare Project made a profit or a loss.

In January 1996, a housing survey was sent to UH's members to determine their interest in buying homes. Of UH's approximately 20,000 members and beneficiaries, less than 600 responded affirmatively. UH/HL then implemented a lottery to determine the order in which the interested members would get to choose their homes from the eighty-four available. This delayed the project by a few months, but only resulted in forty-three qualified and interested buyers.

It is unclear when, but at some point, UH/HL created Innovative Financial Services [hereinafter, IFS] to be a mortgage lender for the Trovare Project. Although NAMCO and The Mortgage Group were also mortgage brokers on the Trovare Project, UH/HL implemented a program whereby only buyers who obtained their mortgage through IFS would receive a closing credit. Testimony adduced at trial indicated that the

majority of the IFS loan officers were inexperienced and moving very slowly in prequalifying buyers, thus delaying sales.

Near the end of the sixty-day exclusivity period, Carr approached UH's President, Anthony Rutledge, and asked to open the Trovare Project to the general public, but Rutledge refused. Instead, Rutledge required another exclusivity period until December 30, 1996, this time open to all union members.

In October 1996, NAMCO left the project.[3] Without NAMCO's silent second mortgage program, Carr developed and worked with UH attorneys to implement a "deferred fee acquisition" program, which would help UH members qualify and be able to buy the homes. UH, however, decided not to implement the program.

The Trovare Project suffered from various other delays and weak sales. In their respective opening briefs, both UH/HL and SCD point fingers at each other as to the cause of the problems.

In or around March 1997, GECH, with the consent of HL, provided an extension to the revolving construction loan of $3.15 million.

In or around September 1997, Carr met with Rutledge, and according to Carr, Rutledge: (1) offered to have UH provide a revolving line of credit to finance construction of the remaining thirty-seven homes in the Trovare Project; and (2) agreed to give SCD a year extension on the HL Note. According to Carr, however, Rutledge changed his mind in November 1997.

In December 1997, SCD again applied to GECH for a modification of the construction loan. GECH agreed to the construction loan modification, on the condition that the junior lienholders—i.e., HL and Financial/Pflueger—also consent.

In January 1998, GECH officially extended the maturity date on SCD's construction loan from December 15, 1997 to February 28, 1998. However, as of December 15, 1997, SCD was in default to HL on the $3 million loan and the $1.5 million release fee. As of February 28, 1998, SCD was also in default

to GECH. Michael Wright, the loan officer for GECH, testified that GECH did not foreclose on SCD's loan because Carr was in discussions with HL for HL to pay SCD's debt to GECH.

On May 13, 1998, GECH wrote to Carr to inform him that it would not renew the loan.

On August 7, 1998, GECH sold its loan and all of its rights vis-a-vis SCD to HL. Carr and UH/HL then entered into months of negotiation concerning SCD's repayment.

On December 8, 1998, Carr and his attorneys met with UH/HL attorneys at the latter's offices. The UH/HL attorneys told Carr that unless he immediately signed documents conveying all thirty-seven remaining unsold lots in the Trovare Project to UH or its designee, UH/HL would file a foreclosure action against Carr and his corporations. At about 8:30 a.m. the next morning, UH/HL faxed a settlement proposal letter to SCD's attorneys, which stated that Carr had until 2:00 p.m. that day to accept UH/HL's proposal or UH/HL would file a foreclosure action. One of the conditions of the proposal letter was that SCD release all claims concerning development of the Trovare Project:

> SCD and the Carr Entities dismiss, waive, release finally and forever, any and all claims relating to the Note, Mortgage, the development of the property, and any other matters between the parties relating to the development of the same.

Four hours later, at about 12:30 p.m., UH/HL faxed over another document, titled "Agreement." Paragraph 3 of the Agreement [hereinafter, paragraph 3 or recovery limitation], provides in full:

> 3. Reference is made to that certain Promissory Note dated December 13, 1995, in the principal amount of $3,000,000 made by Carr Development and Carr in favor of Hale Lokahi (the "Hale Lokahi Note"). SCD, Carr Development and Carr agree that if at any time SCD, Carr Development and/or Carr (i) *asserts any claim or right of offset against Hale Lok-*

---

**3.** UH/HL and SCD both blame each other for NAMCO's departure and the resulting failure of the silent second mortgage program.

*ahi, Thorns Five* [4] *or their affiliates*, officers, employees, members, representatives or attorneys *that in any way related [sic] to the transaction described in the Closing Documents, the Hale Lokahi Note or any matter related thereto*, and (ii) such claim or right of offset is upheld, recovery on the basis of such claim or right of offset, including but not limited to the damages awarded, shall be limited to the amounts due under the Hale Lokahi Note, with the appropriate credits having been made under the Hale Lokahi Note as provided in the Confirmation Statement.

(Emphases added.) The Confirmation Statement referred to in the Agreement provides:

1. Upon the recordation of the Deed conveying the Model Home to Hale Lokahi and the recordation of the Deed conveying the Lots to Thorns Five, which Deeds are delivered by SCD herewith (the "Recordation Date"), an amount equal to the Fair Market Value of the Lots (defined below) shall be credited to the unpaid balances of the Hale Lokahi Note and the Financial/Pflueger Note in the following manner:

(a) Five-sixths (5/6) of the Fair Market Value of the Lots shall be credited to the unpaid balance of the Hale Lokahi Note; and

(b) One-sixth (1/6) of the Fair Market Value of the Lots shall be credited to the unpaid balance of the Financial/Pflueger Note.

"Fair Market Value of the Lots" shall mean the fair market value of the Lots as of the Recordation Date as determined by an independent appraiser which shall be The Halstrom Group Inc.

UH/HL's attorney told SCD's attorney that unless Carr signed the Agreement at a 2:00 p.m. meeting, UH/HL would immediately file a foreclosure action against Carr and his companies. At the meeting, Carr was told that he could not make any changes to the Agreement. Carr signed the Agreement to prevent a foreclosure action.

On thirty-one of the thirty-seven lots deeded over, UH/HL developed, marketed, and sold a housing project called "Lokahi Trovare in Ewa." That project allegedly used plans, materials, and property developed by SCD for the Trovare Project. Additionally, UH implemented the deferred fee acquisition program, which UH had refused to implement while working with SCD, and sold out the Lokahi Trovare in Ewa Project.

B. *Procedural History*

Less than five months after signing the Agreement, on May 3, 1999, SCD filed a complaint against UH/HL alleging causes of action for breach of fiduciary duty, breach of the covenant of good faith and fair dealing, promissory estoppel, intentional and negligent interference with prospective economic advantage and contractual relations, fraud and intentional misrepresentation, prima facie tort, economic duress/business compulsion, partnership liability, and civil conspiracy [hereinafter, SCD Complaint].

Four days later, on May 7, 1999, HL filed a lawsuit against SCD, claiming breach of contract for amounts due under the Note, negligent and intentional misrepresentation, and promissory estoppel [hereinafter, HL Complaint]. On August 18, 1999, the two actions were consolidated into Civil No. 99–1781.

On May 25, 2001, UH/HL filed Motion for Partial Summary Judgment asserting that, even assuming SCD was to prevail on its affirmative claims against UH/HL, SCD was nonetheless limited in the amount of damages which it could recover pursuant to the recovery limitation in the Agreement. The motion came on for hearing on July 2, 2001. The circuit court's August 10, 2001 Order granting UH/HL's motion provides in relevant part:

1. That certain written Agreement dated December 9, 1998 . . . is not ambiguous;

2. By the terms of the aforesaid Agreement, even assuming *arguendo* that Plaintiffs were to prevail on their affirmative claims against Defendants in the above-

---

4. Thorns Five is a Hawai'i limited liability company whose members are HL and Financial/Pflueger.

entitled consolidated action, the amount of damages which Plaintiffs may recover against Defendants in the above-entitled consolidation action, is limited in accordance with the terms of the Agreement, *to wit:* the amount of damages which Plaintiffs may recover against Defendants is limited to the amounts due and owing under that certain Promissory Note dated December 13, 1995 in the principal amount of $3,000,000.00 made by Stanford S. Carr Development Corporation and Stanford S. Carr in favor of Hale Lokahi, Ltd. ("Hale Lokahi Note"), with the appropriate credits having been made under the Hale Lokahi Note as provided in that certain Confirmation Statement dated December 9, 1998 by and between SCD Ewa Corporation, Hale Lokahi, Ltd., Thorns Five LLC, Financial Consulting Group, Inc., Pflueger Properties, Stanford S. Carr Development Corporation and Stanford S. Carr;

3. There was valid and adequate consideration for the aforesaid agreement by Hale Lokahi, Ltd. and Thorns Five LLC providing [SCD] additional time to review and to have their attorneys review the closing documents ..., as requested by [SCD], and by not exercising the right to immediately file a foreclosure action[.]

Jury trial commenced in April 2003. At the close of SCD's evidence, UH/HL moved to enter judgment in their favor on the partnership claim, arguing that there was insufficient evidence to submit the claim to the jury. The court denied the motion. At the close of all of the evidence, UH/HL renewed their Motion for Judgment as a Matter of Law, which the court denied.

At the conclusion of trial, SCD's claims against UH/HL for Breach of Duty of Good Faith and Fair Dealing (Count II), Promissory Estoppel (Count III), Intentional Interference With Prospective Business Advantage (Count V), Negligent Misrepresentation (Count XI), and Partnership Liability (Count XIII)[5] were submitted to the jury. HL's

claim for Breach of Contract (Count I) was also submitted to the jury.

On May 16, 2003, the jury, on a Special Verdict Form,[6] returned its verdict in favor of SCD and against UH/HL on Count II for Breach of Duty of Good Faith and Fair Dealing and Count XIII for Partnership Liability, and against UH on Count V for Intentional Interference With Prospective Business Advantage. The jury awarded $2,827,423.00 in damages to SCD. With respect to HL's Breach of Contract claim under the HL Note, the jury found that, notwithstanding SCD's breach of contract, SCD's performance on the HL Note was excused because: (1) HL prevented SCD from performing on the HL Note; and (2) HL breached its duty of good faith and fair dealing to SCD.

On July 24, 2003, SCD filed: (1) its "Motion for Determination that Plaintiffs' Right to Recover Damages Under the May 16, 2003 Jury Award is Not Limited By That Certain December 9, 1998 'Agreement' "; and (2) a motion for attorneys' fees and costs. In the first motion, SCD requested that the court enter an order confirming that the Agreement does not bar or limit the jury's award of $2,827,423.00, arguing:

(1) The December 9, 1998 Agreement, and specifically the provision limiting [SCD's] recovery of damages, is not enforceable due to a failure of consideration in that the Note, which was given by [SCD] as consideration, following the jury's finding that the Note is unenforceable [sic].

(2) The December 9, 1998 Agreement purporting to limit [SCD's] recovery of damages is void, entitling [SCD] to rescission, because the jury found that [UH/HL] breached their partnership duties to [SCD].

(3) The limitation of damages provision in the December 9, 1998 Agreement is not enforceable against [SCD] since, under basic contract principles, [UH/HL] are not entitled to gain the benefit of their bargain

---

5. It should be noted that "Partnership liability" is not a claim for which relief can be granted. It appears that SCD meant to assert a claim of breach of partnership duties, including fiduciary duties, the duty of loyalty, and the duty of care.

However, SCD withdrew its claim of breach of fiduciary duties prior to closing argument.

6. The Special Verdict Form was sealed by order of the court on May 23, 2006.

due to their breach of the covenant of good faith and fair dealing.

A hearing was held on both motions on August 25, 2003. The court orally denied the first motion and took the second motion under advisement.

On September 5, 2003, the court entered its written order denying SCD's "Motion for Determination that Plaintiffs' Right to Recover Damages Under the May 16, 2003 Jury Award is Not Limited By That Certain December 9, 1998 'Agreement.'" The order provides in relevant part:

> [T]he Court finds that this Motion is, in essence, a motion for reconsideration of the prior [August 10, 2001] ruling of the Court on a motion for partial summary judgment, and that there are no new facts and no new law before the Court to support the Court's reconsideration of the Court's prior determination.
>
> Further, with regard to the arguments put forth with regard to a subsequent failure of consideration, the Court does not find merit to that argument, and, in fact, there was evidence presented at trial with regard to the accounting of the amounts due presented by the Defendant, that there was a credit given for the fair market value of the lots.

SCD's motion for attorneys' fees and costs was granted in the amount of $781,663.52, including $707,309.98 in attorneys' fees and $74,353.54 in costs.

Judgment was entered on February 2, 2004 and amended on September 22, 2004. On February 13, 2004, UH/HL filed a Motion for Judgment as a Matter of Law, or in the Alternative, for a New Trial, again asserting, *inter alia*, that there was insufficient evidence to submit to the jury the question of whether there was a partnership between SCD and UH and/or HL. After a hearing on March 5, 2004, the circuit court entered an order denying the motion on March 19, 2004.

SCD filed its timely Notice of Appeal on October 21, 2004. UH/HL filed their timely cross-appeal twenty minutes later.

## II. *STANDARDS OF REVIEW*

### A. *Summary Judgment*

We review the circuit court's grant or denial of summary judgment *de novo*. *Hawai'i [sic] Community Federal Credit Union v. Keka*, 94 Hawai'i 213, 221, 11 P.3d 1, 9 (2000). The standard for granting a motion for summary judgment is settled:

> [S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.
>
> *Id.* (citations and internal quotation marks omitted).
>
> *Coon v. City and County of Honolulu*, 98 Hawai'i 233, 244–45, 47 P.3d 348, 359–60 (2002) (second alteration in original).

*Kau v. City & County of Honolulu*, 104 Hawai'i 468, 473–74, 92 P.3d 477, 482–83 (2004). We have further explained the burdens of the moving and non-moving parties on summary judgment as follows:

> The burden is on the party moving for summary judgment (moving party) to show the absence of any genuine issue as to all material facts, which, under applicable principles of substantive law, entitles the moving party to judgment as a matter of law. This burden has two components.
>
> First, the moving party has the burden of producing support for its claim that: (1) no genuine issue of material fact exists with respect to the essential elements of the claim or defense which the motion seeks to establish or which the motion questions; and (2) based on the undisputed

facts, it is entitled to summary judgment as a matter of law. Only when the moving party satisfies its initial burden of production does the burden shift to the non-moving party to respond to the motion for summary judgment and demonstrate specific facts, as opposed to general allegations, that present a genuine issue worthy of trial.

Second, the moving party bears the ultimate burden of persuasion. This burden always remains with the moving party and requires the moving party to convince the court that no genuine issue of material fact exists and that the moving part is entitled to summary judgment as a matter of law.

*French v. Hawaii Pizza Hut, Inc.*, 105 Hawai'i 462, 470, 99 P.3d 1046, 1054 (2004) (quoting *GECC Fin. Corp. v. Jaffarian*, 79 Hawai'i 516, 521, 904 P.2d 530, 535 (App. 1995)) (emphasis deleted).

### B. *Judgment as a Matter of Law*

 When a party seeks appellate reversal of a jury verdict based upon the claim of insufficient evidence, the party is, in effect, seeking appellate review of the trial court's denial of either a motion for directed verdict, a motion for JNOV, or a motion for a new trial. *See Sheraton Hawaii Corp. [v. Poston]*, 51 Haw. 142,] 147–48, 454 P.2d [369,] 372–73 [ (1969) ].

It is well settled that a trial court's rulings on

> directed verdict or JNOV motions [are reviewed] de novo. Verdicts based on conflicting evidence will not be set aside where there is substantial evidence to support the jury's findings. We have defined "substantial evidence" as credible evidence which is of sufficient quality and probative value to enable a [person] of reasonable caution to support a conclusion.

> In deciding a motion for directed verdict or JNOV, the evidence and the inferences which may be fairly drawn therefrom must be considered in the light most favorable to the nonmoving party and either motion may be granted only where there can be but one reason-

able conclusion as to the proper judgment.

> *Carr v. Strode*, 79 Hawai'i 475, 486, 904 P.2d 489, 500 (1995) . . . . Thus, "[w]here there is conflicting evidence, or there is insufficient evidence to make a one-way verdict proper, [JNOV] should not be awarded." *Id.* at 487, 904 P.2d at 501 (internal quotations and citations omitted).

*Lee v. Aiu*, 85 Hawai'i 19, 30–31, 936 P.2d 655, 666–67 (1997) (citation omitted).

*In re Estate of Herbert*, 90 Hawai'i 443, 454, 979 P.2d 39, 50 (1999).

### C. *Motion for New Trial*

 Both the grant and the denial of a motion for new trial is within the trial court's discretion, and we will not reverse that decision absent a clear abuse of discretion. *Richardson [v. Sport Shinko (Waikiki Corp.) ]*, 76 Hawai'i 494,] 503, 880 P.2d [169,] 178; *see also Stahl v. Balsara*, 60 Haw. 144, 152, 587 P.2d 1210, 1215 (1978) . . . . Unlike motions for a directed verdict or a JNOV, the movant need not, on a motion for new trial, convince the court to rule that no substantial evidence supports its opponent's case, but only that the verdict rendered for its opponent is against the manifest weight of the evidence. *Richardson*, 76 Hawai'i at 503, 880 P.2d at 178.

*Carr*, 79 Hawai'i at 488, 904 P.2d at 502. "A . . . court abuses its discretion whenever it exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party." *Abastillas v. Kekona*, 87 Hawai'i 446, 449, 958 P.2d 1136, 1139 (1998) (citations and internal quotation marks omitted).

In cases of conflicting evidence, the credibility of the witnesses and the weight to be given their testimony are within the province of the trial court and, generally, will not be disturbed on appeal. *See Steinberg v. Hoshijo*, 88 Hawai'i 10, 18, 960 P.2d 1218, 1226 (1998) (citation omitted). It is not the function of appellate courts to second-guess the trier of fact where there is substantial evidence in the record to sup-

port its conclusion. *See Krohnert v. Yacht Systems Hawaii, Inc.*, 4 Haw.App. 190, 197, 664 P.2d 738, 743 (1983).

*Herbert*, 90 Hawai'i at 454, 979 P.2d at 50.

### D. *Attorneys' Fees and Costs*

 "This court reviews the denial and granting of attorney's fees under the abuse of discretion standard." *Chun v. Bd. of Trs. of Employees' Ret. Sys. of State of Hawai'i*, 106 Hawai'i 416, 431, 106 P.3d 339, 354 (2005) (citations, brackets, ellipses, and quotation signals omitted).

 "The award of a taxable cost is within the discretion of the trial court and will not be disturbed absent a clear abuse of discretion." *Wong v. Takeuchi*, 88 Hawai'i 46, 52, 961 P.2d 611, 617 (1998) (citation omitted).

### E. *Jury Instructions*

 "The standard of review for a trial court's issuance or refusal of a jury instruction is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading." *State v. Haili*, 103 Hawai'i 89, 101, 79 P.3d 1263, 1275 (2003) (quoting *State v. Balanza*, 93 Hawai'i 279, 283, 1 P.3d 281, 285 (2000)).

### III. *DISCUSSION*

### A. *The Circuit Court Did Not Err in Granting UH/HL's Motion For Partial Summary Judgment.*

SCD asserts that the circuit court erred in granting UH/HL's motion for partial summary judgment because: (1) it erroneously ruled that the Agreement is broad enough to preclude SCD from recovering on the claims set forth in the SCD Complaint; (2) in the alternative, the Agreement is ambiguous and there is a question of fact as to the parties' intent; and (3) the Agreement fails for lack of consideration. We disagree.

### 1. The Agreement Precludes SCD from Recovering on the Claims Set Forth in the SCD Complaint.

 The recovery limitation provision in paragraph 3 of the Agreement provides that, if SCD asserts *"any claim or right of offset against Hale Lokahi, Thorns Five or their affiliates ... that in any way related [sic] to the transaction described in the Closing Documents, the Hale Lokahi Note or any matter related thereto,"* (emphases added) recovery shall be limited to the amounts due under the HL Note.

#### (a) *"Any claim or right of offset"*

SCD first argues that the phrase "any claim or right of offset" means any claim of offset and any right of offset—the words claim and right being synonymous with each other and both describing the word offset. According to this interpretation, the Agreement is inapplicable because SCD did not assert any claim of offset or any right of offset. UH/HL, on the other hand, interpret that phrase as describing two separate things—(1) any claim and (2) any right of offset. We agree with UH/HL that the Agreement clearly encompasses claims and rights of offset as discrete categories.

We have long expressed our disapproval of interpreting a contract such that any provision be rendered meaningless. *See Reed & Martin, Inc. v. City & County of Honolulu*, 50 Haw. 347, 349, 440 P.2d 526, 528 (1968) (interpreting contract so as not to render a clause of the contract meaningless); *Richards v. Ontai*, 19 Haw. 451, 453–54 (1909) (construing terms of lease so as not to render a clause of the lease meaningless). *See also* Restatement (Second) of Contracts § 203 ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect[.]"); *Candlelight Props., LLC v. MHC Operating Ltd. P'ship*, 750 N.E.2d 1, 17 (Ind. Ct.App.2001) (explaining that in interpreting the rights and duties under a promissory note and a mortgage, the court "make[s] all attempts to construe the language in a contract so as not to render any words, phrases, or terms ineffective or meaningless"). While SCD's interpretation would render either the word "claim" or the word "right" superfluous, UH/HL's interpretation would give effect to both words. Thus, the circuit court

did not err in ruling that the Agreement encompasses "claims" asserted by SCD and not merely "claims of offset."

(b) *"Related to the transaction described in the Closing Documents, the Hale Lokahi Note or any matter related thereto"*

SCD next contends that the language describing the claims encompassed by the Agreement—"related to the transaction described in the Closing Documents, the Hale Lokahi Note or any matter related thereto"—does not include the claims in the SCD Complaint, which are based on: (1) UH/HL's breach of their promise to provide new construction financing; (2) UH/HL's refusal to consent to an extension of the GECH construction loan; and (3) UH/HL's agreement to buy out the GECH loan. SCD argues that none of these claims are related to the Closing Documents or the HL Note; rather, SCD asserts, they arise out of UH/HL's breach of partnership duties, and thus, are not included under the Agreement. This assertion is without merit.

The language of the Agreement encompasses claims that are in *"any way related* to the transaction described in the Closing Documents, the Hale Lokahi Note *or any matter related thereto."* The plain meaning of this broad language clearly encompasses SCD's claims, which arose from the HL Note, the lender/borrower relationship created by the HL Note, and matters closely related thereto.[7]

■ While SCD may have intended this language to mean something other than what its plain meaning indicates, it is well settled that "the purely subjective, or secret, intent of a party in assenting is irrelevant in an inquiry into the contractual intent of the parties." *Standard Management, Inc. v. Kekona,* 99 Hawai'i 125, 134, 53 P.3d 264, 273 (App.2001). Accordingly, SCD's claims

clearly fall within the scope of paragraph 3 of the Agreement, and the circuit court did not err in so ruling.

**2. The Agreement Is Not Ambiguous.**

■ SCD's alternative argument—that the Agreement is ambiguous, and thus, not subject to summary judgment—is also without merit. We have stated that "[a] court should look no further than the four corners of the document to determine whether an ambiguity exists. The parties' disagreement as to the meaning of a contract or its terms does not render clear language ambiguous." *Found. Int'l, Inc. v. E.T. Ige Constr., Inc.,* 102 Hawai'i 487, 497, 78 P.3d 23, 33 (2003) (citations and quotation marks omitted). Having determined above that the Agreement clearly encompasses the claims raised by SCD, we hold that the Agreement is not ambiguous and summary judgment was therefore appropriate.

**3. The Agreement Does Not Fail for Lack of Consideration.**

■ SCD also asserts that the Agreement fails for lack of consideration because the "Agreement provided no benefit whatsoever to [SCD] and did not obligate [UH/HL] to do anything other than what they were already required to do[.]" UH/HL counter that the consideration for the Agreement included: (1) granting Carr additional time to review and to have his attorneys review the Closing Documents, as they had requested; and (2) not exercising the right to immediately file a foreclosure action. UH/HL's assertions have merit.

■ This court has stated that "[a] compromise, like any other contractual agreement, must be supported by consideration." *Sylvester v. Animal Emergency Clinic of Oahu,* 72 Haw. 560, 567, 825 P.2d 1053, 1057 (1992) (citation omitted). It is

7. SCD also contends that "Mr. Carr understood paragraph 3 of the Agreement to mean that if there was a Court ruling of any claims asserted by him and his companies regarding the Trovare Project, any actual damages incurred would have to be paid by [UH/HL] to compensate Mr. Carr and his companies for any loss." Not only is this understanding wholly unsupported by the language of the Agreement, it is contrary to SCD's assertions that (1) SCD understood the phrase "claim or right of offset" as not including mere claims, and (2) SCD understood the phrase "related to the transaction described in the Closing Documents, the Hale Lokahi Note or any matter related thereto" as not including all claims regarding the Trovare Project.

well established that "[f]orbearance to exercise a right is good consideration for a promise." *Shannon v. Waterhouse*, 58 Haw. 4, 6, 563 P.2d 391, 393 (1977) (citations omitted). Here, it is undisputed that UH/HL forbore from filing a lawsuit against SCD on the HL Note. Carr conceded that he benefitted from UH/HL's forbearance; he testified that he agreed to the Agreement because the filing of a foreclosure action by UH/HL at that time could have irreparably damaged his company's reputation and jeopardized a number of pending real estate deals he had going on the outer islands. Under these circumstances, we agree with the circuit court that forbearance by UH/HL in not immediately filing a foreclosure action (together with providing Carr and his attorneys additional time to review the closing documents) provided valid consideration for the Agreement.

SCD alternatively argues that because the jury found that the HL Note was unenforceable, UH/HL had no right to file a lawsuit on the HL Note, and thus, UH/HL's forbearance in not filing the foreclosure lawsuit did not constitute good consideration.

We have stated:

> Forbearance to sue on a disputed claim, even though it is an invalid one, is a good consideration for a new promise or a compromise, where the party forbearing is acting in good faith. But if he knows the claim to be unfounded and gains an advantage by it through a compromise, his action is fraudulent, and no consideration arises.

*Shannon*, 58 Haw. at 6, 563 P.2d at 394 (citation omitted). The record reveals no evidence or inference that UH/HL did not have a good faith belief that their claim on the HL Note was valid. Although the jury found that UH/HL breached their duty of good faith and fair dealing in not working with SCD towards the completion of the Trovare Project, the jury did not specifically find that UH/HL did not have a good faith belief that the claim on the HL Note was valid or that UH/HL entered into the Agreement in bad faith. Thus, UH/HL's forbearance to sue on the HL Note, whether valid or not, constituted good consideration for the Agreement.

Accordingly, the circuit court did not err in granting UH/HL's motion for partial summary judgment because the Agreement is supported by valid consideration and encompasses the claims brought by SCD such that SCD's recovery on those claims is limited accordingly.

B. *The Circuit Court Did Not Err in Denying SCD's "Motion For Determination That Plaintiffs' Right to Recover Damages Under The May 16, 2003 Jury Award Is Not Limited By the December 9, 1998 'Agreement.'"*

SCD next contends that the circuit court erred in denying its "Motion For Determination That Plaintiffs' Right to Recover Damages Under The May 16, 2003 Jury Award Is Not Limited By That Certain December 9, 1998 'Agreement'" because "once the jury determined that the Note was unenforceable and that [UH/HL] breached their partnership duties and duties of good faith and fair dealing to [SCD], the Agreement became unenforceable, allowing [SCD] to now collect their jury award in the amount of $2,827,423.00." The circuit court, treating the motion as a motion for reconsideration of its grant of partial summary judgment in favor of UH/HL, denied it, stating that "there are no new facts and no new law before the Court to support the Court's reconsideration of the Court's prior determination." We agree with the circuit court's denial of SCD's motion.

**1. The Agreement is Not Unenforceable Due to Failure of Consideration.**

SCD contends that the Agreement does not bar the jury's $2,827,423.00 award in favor of SCD because the jury determined that SCD's performance on the HL Note is excused, resulting in a partial failure of consideration for the Agreement.[8] SCD cites

---

8. UH/HL alleges that, because SCD did not plead failure of consideration in its Complaint, this argument is barred by law inasmuch as failure of consideration is an affirmative defense that must be specifically pled. SCD counters that it pled failure of consideration in its Answer to HL's Complaint, wherein it stated: "Hale Lokahi's claims are barred, in whole or in part, by lack of

various sources for the proposition that "[w]hen there is a failure of consideration, a contract, valid when formed, becomes unenforceable because the performance bargained for has not been rendered." This argument is unavailing.

SCD asserts that paragraph 3 of the Agreement clearly states that the recovery limitation "is given in exchange for a 'credit' in the amount due under the Note based on the value of the lots and model home that [SCD was] being forced to deed over to [UH/HL]." The language of paragraph 3 states no such thing. Rather, paragraph 3 provides that recovery "shall be limited to the amounts due under the Hale Lokahi Note, with the appropriate credits having been made under the Hale Lokahi Note as provided in the Confirmation Statement." This language does not support SCD's contention that the recovery limitation is in *exchange* for the credit; rather, it merely provides that the amount due under the HL Note shall reflect the credits given. Thus, even assuming, *arguendo*, that there was a failure to give credit for the lots, such failure does not necessitate failure of the recovery limitation. As discussed in Section III.A.3, *supra*, UH/HL's forbearance of their right to immediately file a foreclosure action constituted valid consideration for the Agreement, including the recovery limitation in paragraph 3.

### 2. The Jury's Finding that UH/HL Breached Their Partnership Duties Does Not Render the Agreement Unenforceable.

█ SCD also asserts that the Agreement is unenforceable because the jury found that UH and HL both breached their partnership duties by entering into the Agreement. Specifically, SCD asserts, "The only reasonable inference is that the jury found that [UH/HL] breached their fiduciary duties prior to or because of the forced execution of

the December 9, 1998 Agreement." We disagree.[9]

The jury did not specifically find that entering into the Agreement was a breach of partnership duties. Rather, the jury only found that UH and HL each breached "one or more of its partnership duties" to SCD. SCD's argument is therefore based on speculation as to what the jury may have been thinking. Thus, UH/HL's breach of their alleged partnership duties does not render the recovery limitation provision in the Agreement unenforceable.

### 3. UH/HL Are Not Estopped from Enforcing the Recovery Limitation Provision.

█ SCD finally asserts that because the jury found that UH/HL breached their duty of good faith and fair dealing and prevented SCD's performance on the HL Note, they should be estopped from benefitting from the recovery limitation in the Agreement. This argument is without merit.

Although SCD characterizes its argument in terms of estoppel, SCD does not actually raise or discuss the elements of estoppel and their applicability here. Rather, SCD cites two Hawai'i cases, and a variety of case law from other jurisdictions, for the propositions that: (1) "If a promisor himself is the cause of the failure of performance ... of a condition upon which his own liability depends, he cannot take advantage of the failure." *Kahili, Inc. v. Yamamoto*, 54 Haw. 267, 272, 506 P.2d 9, 12 (1973) (citations and brackets omitted); and (2) "a party cannot recover for a breach of contract if he fails to comply with the contract himself." *PR Pension Fund v. Nakada*, 8 Haw.App. 480, 491, 809 P.2d 1139, 1146 (1991) (citation and brackets omitted). Both of these cases essentially hold that a party who breaches or causes the other party to breach an agreement cannot enforce the agreement to his or her benefit. These cases are not applicable here because the jury in

consideration." This assertion appears contrary to the assertion in its Opening Brief that there is a distinction between "lack" of consideration and "failure" of consideration. Nevertheless, giving SCD the benefit of the doubt, we address SCD's failure of consideration argument on its merits.

9. For purposes of this section, we assume, *arguendo*, that the jury properly found that UH/HL entered into a partnership with SCD. However, *see infra* Section III.C, which concludes that, as a matter of law, a partnership did not exist.

the instant case did not find, and there is no evidence to indicate, that UH/HL breached the Agreement or caused SCD to fail to perform on the Agreement. The jury's finding that UH/HL breached and prevented SCD's performance on the HL Note does not implicate a breach of the Agreement.

To the extent that SCD is arguing that the recovery limitation is void as unconscionable or otherwise "manifestly inequitable and unjust," these arguments are also unavailing. Carr is a sophisticated businessman and was represented by counsel when the Agreement was executed. It was not unforeseeable at the time the Agreement was entered that the amount due on the HL Note could be zero, thus limiting SCD's recovery to zero. It is not unreasonable that a sophisticated businessman, under the pressure of imminent foreclosure, would agree to such a recovery limitation. As discussed in Section III.A.3, *supra*, Carr conceded that he agreed to the Agreement because the filing of a foreclosure action by UH/HL at that time could have irreparably damaged his company's business. This court has stated that where "[i]t appears that the contract was made openly and fairly, and with the entire understanding of both parties[, w]hether it was a wise and judicious contract, is not for the Court to say[.]" *Burbank v. Wood*, 2 Haw. 591, 599–600 (1862). *See also Watson v. Ingram*, 124 Wash.2d 845, 881 P.2d 247, 250 (1994) ("It is not the role of the court to enforce contracts so as to produce the most equitable result. The parties themselves know best what motivations and considerations influenced their bargaining, and, while, the bargain may be an unfortunate one for the delinquent party, it is not the duty of courts of common law to relieve parties from the consequences of their own improvidence." (Brackets, ellipses, citations, and internal quotation marks omitted.)). Therefore, there is no reason why the recovery limitation provision of the Agreement should not be enforceable as written.

C. *The Circuit Court Erred In Submitting the Question of Whether or Not a Partnership Existed to the Jury.*

In their cross-appeal, UH/HL contend that the circuit court erred in submitting the question of whether or not a partnership existed to the jury because, as a matter of law, there was no partnership inasmuch as there was no agreement to share profits. SCD counters that "[t]he loan commitment letter (Ex. J–9) and the letter setting forth the numerous terms of the parties' obligations concerning development of the Trovare Project (Ex. J–10) created a partnership agreement between the parties." We agree with UH/HL.

Hawai'i Revised Statutes (HRS) § 425–106 (1993), entitled "Partnership defined," provided that "[a] partnership is an association (including a joint venture) of two or more persons to carry on as co-owners a business for profit." Both SCD and UH/HL agree that Hawai'i law requires that an agreement to share profits must be shown in order to prove the existence of a partnership. *See, e.g., Winkelbach v. Honolulu Amusement Co.*, 20 Haw. 498, 503 (1911) ("[A]n agreement to share profits is an essential element of every true partnership, and though its presence is not conclusive that a partnership exists, its absence is conclusive that a partnership does not exist." (Citation omitted.)).

SCD asserts that an agreement to share profits existed in the instant case inasmuch as UH/HL received the following "tangible benefits," which "show[ ] that both [UH] and [HL] profited from the partnership with [SCD]":

[ (1) ] $1.5 million release fee

[ (2) ] Exclusivity period for [UH] members and later members of other unions

[ (3) ] Lower sales prices

[ (4) ] Directing buyers to a[UH] subsidiary, IFS

[ (5) ] Limiting buyer credit programs to buyers who went through IFS

[ (6) ] 5–year deed restriction and shared appreciation program

We initially note that the "benefits" received by UH/HL numbered (2) through (6) do not constitute "profits" under that word's common meaning. *See* Black's Law Dictionary 1246 (8th ed.2004) (defining "profit" as "[t]he excess of revenues over expenditures in a business transaction; GAIN"). Moreover, SCD cites no cases to support the

proposition that receiving such "benefits" from an agreement is equivalent to *sharing profits*. Accordingly, the receipt of these benefits does not evince an agreement to share profits.

The question, therefore, is whether the $1.5 million release fee constitutes profit sharing. HRS § 425–107 (1993), entitled "Rules for determining the existence of a partnership," provided, in relevant part:

> In determining whether a partnership exists, these rules shall apply:
>
> . . . .
>
> (4) The receipt by a person of a share of the profits of a business is prima facie evidence that the person is a partner in the business, but *no such inference shall be drawn if such profits were received in payment:*
>
> . . . .
>
> (d) *As interest on a loan,* though the amount of payment vary with the profits of the business[.]

(Emphases added.) *See also Barnes v. Collins,* 16 Haw. 340, 343 (1904) ("If the right to share in the profits is merely by way of . . . interest for money loaned . . . and not by virtue of ownership of the profits, there is not a partnership.").

The loan commitment provides in pertinent part:

> 6. <u>Loan Fee and Interest Return.</u> A loan fee of $30,000.00 (1.0% of the loan amount) to be paid on or before the date of closing to [HL] (which fee shall not be paid from the loan proceeds). There is a separate interest return of $1,500,000.00 (the "Release Fee") to be paid by Borrower to [HL] on or before 2 years from the date of closing in addition to repaying the loan amount. . . .

(Underlining in original.) This language is clear on its face that the $1.5 million release fee was interest as opposed to a share of profits. Carr's testimony was in agreement: the release fee was interest on a loan. Moreover, the loan commitment and accompanying letter do not evince an intent by the parties to share profits inasmuch as they lack any language commonly utilized in partnership agreements, such as "partnership," "partner," "profits," and does not intimate any community of interest, or co-ownership,

or sharing of profits, tending to show the relationship of partners. *See Winkelbach,* 20 Haw. at 503 (stating that where "[t]here is absolutely no element of profit sharing, or community of interest, or co-ownership contemplated in the money to be received under the agreement[,] . . . . [i]t is clear that the parties by their agreement did not intend or contemplate the sharing of any profits in the capacity of co-principals which is essential to a partnership").

Notwithstanding the language of the loan commitment, SCD asserts that UH/HL consistently referred to SCD as an "equity partner," and referred to the release fee as profit, as set forth in the Background section above. Nevertheless, this court has stated:

> [W]hether an agreement creates a partnership or not depends upon the intention of the parties. But by the intention of the parties is meant, *not what they call or consider the relation into which they enter, but what the relation is in legal effect. The parties may expressly agree that there shall be a partnership and yet such agreement will be ineffective if the specific stipulations do not establish a partnership as [a] matter of law[.]*

*Barnes,* 16 Haw. at 342 (emphasis added). Moreover, regardless of how the parties referred to the $1.5 million release fee prior to the execution of the final loan agreement, the loan commitment expressly stated that "[t]his commitment supersedes any oral or written discussion prior to the date of this commitment letter."

Significantly, Carr conceded that repayment of the loan and release fee was not conditioned upon whether the Trovare Project was profitable or not; the amount owed HL was fixed. Courts in other jurisdictions have held that the receipt of a fixed sum by a lender/alleged partner, regardless of whether there is a profit or loss, does not constitute profit sharing. The case of *Realty Dev. Co. v. Feit,* 154 Colo. 44, 387 P.2d 898 (1963) [hereinafter, *Feit* ], is similar to the instant case. In *Feit,* there was a written agreement providing that Realty Development Company would finance Gamble Land and Development Company, an independent contractor engaged in building homes. *Id.* at 899. In return, Gamble would pay Realty $500 for each home sold. *Id.* Gamble's obli-

gation was absolute, and was not conditioned upon him making a profit. *Id.* The Supreme Court of Colorado, noting that "[t]he chief characteristic of a joint adventure is a joint and not a several profit[,]" held that a joint adventure did not arise between Realty and Gamble. *Id.* (citation and quotation signals omitted). Other jurisdictions are in accord. *See In re Fordham*, 130 B.R. 632, 648 (Bankr.D.Mass.1991) (stating that entitlement to a release fee of $300,000, due and payable in full at the maturity date of the promissory note, does not constitute profit sharing); *In re Computer Personalities Sys., Inc.*, 284 B.R. 415, 422–23 (Bankr.E.D.Pa. 2002) (stating that where payments to one of the parties are not tied to the amount of profit, payments do not constitute profit sharing); *Batterman v. Wells Fargo Ag Credit Corp.*, 802 P.2d 1112, 1117 (Colo.Ct. App.1990) (holding that no profit sharing exists, and hence, no partnership exists, where "one of the parties to the alleged joint venture receives a fixed sum, irrespective of the venture's profits or losses") (citation omitted).

Therefore, even when viewing the evidence and the inferences which may be fairly drawn therefrom in the light most favorable to SCD, the only reasonable conclusion is that a partnership did not exist as a matter of law because SCD and UH/HL did not have an agreement to share profits. Thus, the circuit court erred in submitting the issue of partnership liability to the jury.

D. *The Circuit Court Did Not Err In Denying UH/HL's Motion for Judgment as a Matter of Law, Or, In the Alternative, For a New Trial Because There is Substantial Evidence in the Record to Support the Jury's Verdict That SCD's Performance on the HL Note is Excused.*

 UH/HL next contend that the circuit court erred in denying their Motion for Judgment as a Matter of Law, Or, In the Alternative, For a New Trial, because the circuit court's submission of the partnership liability issue to the jury "wrongly strengthen[ed] [SCD's] affirmative defenses of breach of the duty of good faith and prevention of performance." We disagree.[10]

As stated above, in order for UH/HL to prevail on their appeal of the circuit court's denial of their motion for judgment as a matter of law, UH/HL must convince this court that no substantial evidence supports the jury's verdict. In order for UH/HL to prevail on their appeal of the circuit court's denial of their motion for a new trial, UH/HL must convince this court that the circuit court abused its discretion because the jury's verdict is against the manifest weight of the evidence.

Because the fiduciary duties owed by a partner are different from the duties owed by a lender, it is possible that submitting the partnership liability issue to the jury affected its verdict with respect to SCD's affirmative defenses. It is also possible, however, that, as argued by SCD, the jury's determination in favor of SCD was independent of its finding that a partnership existed and that the jury would have reached the same conclusion even if not presented with the partnership issue. Indeed, the jury instructions with respect to SCD's affirmative defenses are clearly worded in the context of a lender-borrower relationship. In relevant part, the jury instructions stated:

> With regard to Hale Lokahi's claim for breach of contract, if you find that there was a contract and that Plaintiffs breached the contract, Plaintiffs' non-performance under the contract may be excused if Plaintiffs prove by a preponderance of the evidence either of the following affirmative defenses:

---

10. SCD correctly points out that UH/HL did not expressly appeal the jury's verdict with respect to Count II of SCD's Complaint (finding that HL breached its duty of good faith and fair dealing). It is axiomatic that "[i]f a finding is not properly attacked, it is binding; and any conclusion which follows from it and is a correct statement of law is valid." *Kawamata Farms, Inc. v. United Agri Products*, 86 Hawai'i 214, 252, 948 P.2d 1055, 1093 (1997) (citation omitted). We therefore could dispose of the issue by holding that, because we are bound by the jury's finding that HL breached its duty of good faith and fair dealing, we are also bound by the jury's finding that such breach provided SCD with an affirmative defense to HL's breach of contract claim. Nevertheless, we give UH/HL the benefit of the doubt and address the issue on its merits herein.

1. *Breach of the Duty of Good Faith and Fair Dealing*—A party who lends money to a borrower may be precluded from enforcing a loan contract against a borrower if the lender breaches the duty of good faith and fair dealing in the loan contract, and the borrower is unable to repay the loan because of the lender's breach. To prevail on the affirmative defense, Plaintiffs must prove that Defendant Hale Lokahi, Ltd. breached the duty of good faith and fair dealing and that the breach was the sole cause of Plaintiffs' failure to repay the loan.

2. *Prevention of Performance*—It is an implied condition of every contract that one party will not prevent performance by the other party, and thus one party who prevents another party from performing under the contract cannot complain about or recover damages from the non-performance which he himself has brought about. To prevail on the affirmative defense, Plaintiffs must prove that their non-performance of the contract was through no fault of the Plaintiffs and that Defendant Hale Lokahi, Ltd., without legal excuse, actually prevented Plaintiffs from performing.

More significantly, there is substantial evidence in the record to support the jury's finding that UH/HL's actions constituted a breach of the duty of good faith and fair dealing and prevented SCD's performance on the HL Note, even within the lender-borrower context. For example, evidence in the record showed that UH/HL created a for-profit mortgage broker, IFS, and, notwithstanding IFS' lack of experience and competence, imposed IFS on the Trovare Project to generate fees for UH/HL. Caroleen Iseri, the project broker for the Trovare Project, testified that the IFS loan brokers' lack of experience created problems in making and financing sales of the Trovare Project. Iseri testified that the IFS loan brokers' inexperience affected prospective buyers' interest in buying homes in the Trovare Project because they prolonged the process of qualification by failing to ask buyers essential questions and asking potential buyers to produce unnecessary paper work. The record also provides the following evidence of UH/HL's ac-

tions, which support the jury's finding that UH/HL prevented SCD from repaying the HL Note and otherwise breached the duty of good faith and fair dealing: (1) UH/HL required SCD to significantly discount sales prices for the Trovare Project to below market value so that the houses would be affordable for UH union members; (2) although the prices were discounted, UH/HL required SCD to increase the size of the houses at SCD's expense; (3) UH/HL directed that certain lots be "set aside" for friends or relatives of UH/HL personnel, but such friends or relatives never bought the lots; (4) UH/HL refused to allow the Trovare Project to pay courtesy commissions to outside brokers who could have brought non-UH buyers to the Trovare Project, notwithstanding the fact that, as one witness testified at trial, outside brokers typically sell 85% to 90% of homes in new developments; and (5) UH/HL encouraged SCD to develop the "deferred fee acquisition" program for UH members, wasting substantial time, money, and resources inasmuch as it was never implemented for the Trovare Project, but UH/HL then used the program to help sell out the Lokahi Trovare in Ewa Project. The foregoing constitutes substantial evidence supporting the jury's verdict that UH/HL's self-serving actions were a breach of the duty of good faith and fair dealing and impaired the success of the Trovare Project, thus causing SCD's failure to pay back its loan.

Although there is also evidence to support UH/HL's contention that SCD, and not UH/HL, was to blame for the Trovare Project's downfall, this court has stated:

> In cases of conflicting evidence, the credibility of the witnesses and the weight to be given their testimony are within the province of the [trier of fact] and, generally, will not be disturbed on appeal. It is not the function of the appellate courts to second-guess the trier of fact where there is substantial evidence in the record to support its conclusion.

*Herbert*, 90 Hawai'i at 454, 979 P.2d at 50 (citations omitted). Accordingly, there being substantial evidence in the record to support the jury's verdict, the circuit court did not err in denying UH/HL's motion for judgment

as a matter of law, nor did the circuit court abuse its discretion in refusing to grant a new trial.

E. *The Circuit Court Did Not Abuse Its Discretion In Awarding Attorneys' Fees and Costs to SCD In the Amount of $781,663.52.*

UH/HL also assert that the circuit court abused its discretion in awarding attorneys' fees and costs to SCD inasmuch as: (1) SCD cannot recover costs or fees pursuant to the recovery limitation in the Agreement; (2) the court has discretion to deny costs; and (3) SCD failed to sufficiently authenticate and document the costs and fees they seek to recover. SCD counters that: (1) SCD is entitled to attorneys' fees under HRS § 607–14 (Supp.2003) and the express provisions of the HL Note because SCD was the prevailing party on both its complaint and HL's breach of contract claim; (2) attorneys' fees and costs are not precluded by the recovery limitation; and (3) SCD sufficiently authenticated and documented its fees and costs. We agree with SCD.

### 1. SCD is Entitled to Attorneys' Fees Under HRS § 607–14 For Its Successful Defense of HL's Breach of Contract Claim.

██ "Ordinarily, attorneys' fees cannot be awarded as damages or costs unless so provided by statute, stipulation, or agreement." *Weinberg v. Mauch,* 78 Hawai'i 40, 53, 890 P.2d 277, 290 (1995) (citation omitted). HRS § 607–14 provides for attorneys' fees in the instant case:

In all the courts, in all actions in the nature of assumpsit and in all actions on a promissory note or other contract in writing that provides for an attorney's fee, there shall be taxed as attorneys' fees, to be paid by the losing party and to be included in the sum for which execution may issue, a fee that the court determines to be reasonable; provided that the attorney representing the prevailing party shall submit to the court an affidavit stating the amount of time the attorney spent on the action and the amount of time the attorney is likely to spend to obtain a final written judgment, or, if the fee is not based on an

hourly rate, the amount of the agreed upon fee. The court shall then tax attorneys' fees, which the court determines to be reasonable, to be paid by the losing party; provided that this amount shall not exceed twenty-five per cent of the judgment.

. . . .

*The above fees provided for by this section shall be assessed* on the amount of the judgment exclusive of costs and all attorneys' fees obtained by the plaintiff, and *upon the amount sued for if the defendant obtains judgment.*

(Emphases added.) Here, SCD successfully defended HL's claim of breach of contract on the HL Note. Accordingly, SCD is entitled to attorneys' fees under HRS § 607–14.

### 2. The Recovery Limitation in the Agreement Does Not Preclude SCD's Award of Attorneys' Fees and Costs for SCD's Successful Defense of HL's Breach of Contract Claim.

██ UH/HL argue that the recovery limitation precludes an award of fees and costs inasmuch as: (1) the language of the recovery limitation provides that "recovery" is "not limited to the damages awarded," and therefore, also includes (and thus, precludes, in this case) an award of attorneys' fees and costs; and (2) SCD's assertion of the affirmative defenses of prevention of performance and breach of the duty of good faith and fair dealing constituted an assertion of "rights of offset" inasmuch as such defenses offset the amount due on the HL Note, and thus, the recovery of attorneys' fees and costs on the basis of such rights of offset should be precluded. SCD counters that: (1) even if the Agreement precludes recovery of fees and costs based on the claims alleged in SCD's complaint, the Agreement does not preclude an award of attorneys' fees and costs for its successful defense of HL's claim for breach of contract under the HL Note; and (2) the recovery limitation does not preclude an award of fees and costs because SCD's affirmative defenses do not constitute "rights of offset." We agree with SCD. Even assuming, *arguendo,* that the recovery limitation precludes SCD from receiving an award of fees and costs for prevailing on the claims

alleged in its complaint, the recovery limitation does not preclude SCD from receiving an award of fees and costs for successfully defending HL's breach of contract claim.

Contrary to UH/HL's contention, SCD's assertion of its affirmative defenses does not constitute an assertion of "rights of offset." Black's Dictionary defines "offset" as "[s]omething (such as an amount or claim) that balances or compensates for something else; SETOFF." Black's Law Dictionary 1120 (8th ed.2004). Black's also defines "setoff" as "1. A defendant's counterdemand against the plaintiff, arising out of a transaction independent of the plaintiff's claim. 2. A debtor's right to reduce the amount of a debt by any sum the creditor owes the debtor; the counterbalancing sum owed by the creditor." *Id.* at 1404 (internal citations omitted). Additionally:

> The doctrine of setoff, or compensation as it is called in civil law jurisdictions, is essentially an equitable one requiring that *the demands of mutually indebted parties be set off against each other and that only the balance be recovered in a judicial proceeding by one party against the other.* Stated otherwise, the *right of setoff allows entities that owe each other money to apply their mutual debts against each other*, thereby avoiding the absurdity of making A pay B when B owes A. It is a mode that equity adopts to compel the ultimate payment of a debt by one who in justice, equity, and good conscience ought to pay it.

20 Am.Jur.2d *Counterclaim, Recoupment, and Setoff* § 6 (2005) (footnotes omitted) (emphases added). It is clear that a "right of offset" does not encompass the situation where, as here, a party that owes another party money prevails on an affirmative defense, which excuses the amount owed. Thus, SCD's assertion of its defenses did not constitute the assertion of rights of offset or setoff, and thus, the recovery limitation does not preclude attorneys' fees and costs incurred by SCD in successfully defending HL's claim for breach of contract.

### 3. The Circuit Court Did Not Abuse Its Discretion in Awarding $707,309.98 in Attorneys' Fees and $74,353.54 in Costs.

 UH/HL also assert that the circuit court abused its discretion in awarding attorneys' fees and costs because SCD failed to sufficiently authenticate and document the costs and fees. We disagree.

Attached to SCD's motion for fees and costs was the declaration of SCD's counsel, Bruce D. Voss. This declaration provided a sufficient foundation for authentication of the attorneys' fees and costs incurred by SCD, stating that Voss reviewed and approved the charges alleged and that the time spent was reasonable and necessary under the circumstances. Also attached to the motion was Exhibit D, which contained more than 190 pages of invoices including fully itemized time entries relating to the fees and costs requested by SCD.

 Additionally, this court has stated that "the judge is an expert [her]self and knows as well as a legal expert what are reasonable attorney fees, and that the amount of attorney's fees is within the judicial discretion of the court, and in fixing that amount the trial court may proceed upon its own knowledge of the value of the solicitor's services." *In re Thz Fo Farm*, 37 Haw. 447, 453 (1947) (quotation marks, brackets, ellipses, and footnotes omitted). Here, the circuit court judge had personal knowledge of the complexity of the litigation and the nature and quality of the legal services rendered before it. Thus, the circuit court did not exceed the bounds of reason, nor did it disregard rules or principles of law or practice to the substantial detriment of UH/HL in awarding fees and costs.[11]

---

**11.** UH/HL does not challenge any specific costs, but only asserts that the circuit court had discretion to deny costs. The circuit court did not clearly exceed the bounds of reason or disregard rules or principles of law or practice to the substantial detriment of UH/HL in determining that SCD was the prevailing party entitled to costs.

Finally, the amount of attorneys' fees awarded was well within the statutory limitation. HRS § 607–14 provides, in pertinent part, that the amount of attorneys' fees "shall not exceed twenty-five per cent of the judgment" and shall be assessed "upon the amount sued for if the defendant obtains judgment." Here, HL alleged $7,045,794.00 in damages. Because SCD obtained judgment, SCD is entitled to no more than twenty-five percent of that amount, or $1,761,448.50. The circuit court awarded SCD $707,309.98 in attorneys' fees, which is within the statutory limitation.

Accordingly, the circuit court did not abuse its discretion in granting SCD's motion and awarding attorneys' fees and costs in the amount of $781,663.52.[12]

## IV. CONCLUSION

Based on the foregoing, we affirm the circuit court's September 22, 2004 Amended Judgment in part, and reverse in part with respect to Count XIII (Partnership Liability).

---

**12.** With respect to UH/HL's assertion that the circuit court erred in refusing to give UH/HL's jury instructions, UH/HL fail to make any argument in support of this point of error other than their argument that the circuit court erred in submitting the question of partnership liability to the jury. Accordingly, such point is deemed waived. Hawai'i Rules of Appellate Procedure Rule 28(b)(7) ("Points not argued may be deemed waived."). Even if UH/HL had properly argued this point, any error with respect to the circuit court's refusal to give UH/HL's instructions is harmless because, pursuant to the Agreement, SCD's recovery is zero dollars.